CLARENDON AMERICA INSURANCE COMPANY, Plaintiff,

v.

MT. HAWLEY INSURANCE COMPANY, et al., Defendants.

Case No. CV 07–7351 GAF (JWJx).

United States District Court, C.D. California.

Oct. 14, 2008.

David S. Blau, David M. Morrow, David S. Blau Law Offices, Los Angeles, CA, for Plaintiff.

Adam C. Hackett, Mary E. McPherson, Tressler Soderstrom Maloney and Priess LLP, Costa Mesa, CA, for Defendants.

## ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

GARY ALLEN FEESS, District Court.

### I. INTRODUCTION AND BACKGROUND

This case involves a dispute between two insurance companies, Plaintiff Clarendon America Insurance Co. ("Clarendon") and Defendant Mt. Hawley Insurance Co. ("Mt. Hawley"), who paid a settlement of $280,000 on behalf of D.B. Construction Co. ("DB"), for alleged defects in a construction project. The settlement amount was determined in a mediation in which the two carriers participated, although the degree of participation of each is disputed. In the end, Clarendon paid $180,000 of the $280,000 total; Mt. Hawley paid the other $100,000.

In the present suit, Clarendon seeks to recover all of the $180,000 it paid on the ground that its policy was not in effect during the construction period. In the

alternative, it contends that it is entitled, at the very least, to contribution of $40,000 from Mt. Hawley because Mt. Hawley was obligated to fund half of the settlement amount determined through mediation. Mt. Hawley contends that the defects in issue arose in connection with change orders that were performed after the Clarendon policy took effect and that the claim was covered by Clarendon's policy. But, according to Mt. Hawley, even if the Court concludes that there was no coverage under Clarendon's policy, Clarendon acted as a volunteer and has no right to recover the $180,000 it paid or to seek equitable contribution in any sum.

These claims are the subject of cross-motions for summary judgment that the Court now has under consideration. Because the Court concludes that Clarendon's insured completed its work before the Clarendon policy took effect, and because the Court further concludes that Clarendon did not waive its right to assert a claim for indemnification or contribution against Mt. Hawley, Clarendon's motion is **GRANTED** and Mt. Hawley's is **DENIED**.

## II. FACTS

### A. THE CONSTRUCTION PROJECT

In or about April 1999, George C. Hopkins Construction, Co., Inc. ("Hopkins"), a general contractor hired to build a church for the Roman Catholic Archdiocese, hired DB as a subcontractor to install interior and exterior drywall and steel framing studs. (Clarendon MSJ SGI 9; Morrow Decl., Ex. B [Hopkins DB Subcontract Agreement]; Clarendon MSJ SGI ¶ 9.) During the course of construction, Hopkins maintained a record, identified as a daily job report, that recorded on a daily basis the name of each subcontractor working at

the construction site and a general description of the work being performed by that subcontractor. (Algorri Decl. ¶¶ 2–4 & Ex. A.) These reports reflect that DB commenced work on its subcontract on November 22, 1999 (*id.*, Ex. A, at HOP 291) and finished on May 8, 2000 (*id.*, at HOP 424). All work on the project was completed on July 13, 2000. (*Id.*, at 471.) [1] The parties agree that a certificate of occupancy was issued by the City of Hawaiian Gardens on or about August 8, 2000 (*e.g.*, Clarendon Statement of Undisputed Fact ("SUF"), No. 11), and very shortly thereafter the archdiocese took possession of and occupied the building.

### B. CONSTRUCTION DEFECTS ARE DISCOVERED

Some time after the archdiocese commenced occupancy, an issue arose over alleged defects in DB's work. The Archdiocese sought to arbitrate claims for, among other things, "*exterior* wall assembly, [where] the stucco base wall sheathing was left open and exposed to the elements." (Kavcioglu Decl., Ex. A [Archdiocese Amended Claim Statement at 3].) (Emphasis added.) In addition, DB was accused of using the wrong sheathing, "Pabco paper-faced gypsum core product" instead of "DensGlas Gold." (Kavcioglu Decl., Ex. A [Archdiocese Amended Claim Statement at 3].) According to the archdiocese's claim, "This [ ] resulted in mold growth on the inside face of the exterior wall sheathing and on the interior face of the gypsum drywall." (Kavcioglu Decl., Ex. A [Archdiocese Amended Claim Statement at 4].) The archdiocese commenced action on its construction defect claims in arbitration proceedings filed in 2004; in or about January 2006, Hopkins filed a cross-demand against DB and others alleging a contractual defense and asserting a right to equi-

---

1. At the hearing on the motion, Mt. Hawley's counsel conceded that the Daily Job Reports submitted in support of Clarendon's motion are accurate, authentic and complete.

table indemnification for damages caused by DB. (SUF, No. 14; *see* Kavcioglu Decl., Ex. E.)

## C. THE INSURANCE CARRIERS BECOME INVOLVED

Once Hopkins identified DB as the potentially responsible subcontractor, DB tendered defense of its case to Mt. Hawley, which had issued a comprehensive general liability ("CGL") policy for damages that occur in "the coverage territory" during the policy period. (SUF, No. 6.) Mt. Hawley issued such policies to DB for the period June 10, 2001 to June 10, 2002 and for each of the following four years. (SUF, No. 4.) Mt. Hawley received notice of the arbitration in or about December 2005 when Hopkins made a demand that Mt. Hawley defend and indemnify it against the archdiocese's claims. (Kavcioglu Decl., Ex. B.) Mt. Hawley accepted the tender, but six months later tendered to Clarendon, which had issued DB an "occurrence" based CGL which provided coverage for damages resulting from specified events that occurred during the policy period. (SUF, No. 3.) In a letter to Clarendon, Mt. Hawley's counsel wrote:

We understand that Clarendon ... issued a general liability policy to our client, DB Construction Company for the time period of June 10, 2000 to 2001.... Please accept this correspondence as our client's tender of the defense and demand for indemnity of this above-referenced litigation under any and all applicable policies issued to our client by Clarendon.

About two months later, having discovered some change orders that appeared to describe work performed during its policy period, Clarendon responded:

In sum, according to the available information it appears that DB Construction Company ("DB") was still performing work in connection with the church building as of inception of the policy on June 10, 2000. For instance, the subcontract documents include several change orders and other notations that suggest DB may have been on site through October 2000.

## D. SETTLEMENT OF THE CONSTRUCTION DEFECT CLAIMS

On January 26, 2006, Mt. Hawley agreed to provide coverage and defend DB under a reservation of rights. (First McPherson Decl., Ex. 19 [Jan. 26, 2006 coverage letter].) On August 16, 2006 Clarendon likewise agreed to defend DB subject to a reservation of rights:

including but not limited to the right to deny coverage and/or withdraw from the defense, to seek reimbursement of any sums incurred in the defense or indemnity of non-covered claims, and to assert any policy provision or coverage term, limitation, condition or exclusion that may now be or later prove relevant and applicable.

(First McPherson Decl., Ex. 11 [Aug. 16, 2006 letter from David Blau, Clarendon coverage counsel].)

On April 23, 2007 DB and the Archdiocese attended a mediation wherein DB would contribute $280,000. (Blau Decl. ¶ 10.) Mt. Hawley's counsel did not object to the settlement. (Blau Decl. ¶ 10; Morrow Decl. ¶ 18; Clarendon MSJ SGI 41.) However, at the mediation, after the agreement was reached and approved by counsel to both insurers, Mt. Hawley's counsel conveyed to Clarendon's counsel, without explanation, that Mt. Hawley would contribute only $100,000 to the settlement. (Blau Decl. ¶ 10; Morrow Decl. ¶ 18.) Mt. Hawley's counsel who participated in the mediation states: "Prior to the claims ... being settled for $280,000 on April 23, 2007, I told [Clarendon's counsel] that Mt. Hawley would only contribute

$100,000 toward the settlement. . . ." (Devling Decl. ¶ 7.)

On May 2, 2007, ten days after the mediation where DB settled the underlying dispute, Clarendon's coverage counsel wrote to Mt. Hawley's counsel:

> As the settlement needs to be funded in the very near future, Clarendon hereby again demands that Mt. Hawley agree to pay one-half of the settlement reached on DB's behalf ($140,000), or Clarendon will file an action for equitable contribution against Mt. Hawley seeking reimbursement of 100% of the $280,000 settlement. Please recall that according to current information it appears that DB's work was completed prior to the inception of the Clarendon policy period. To be clear, if Mt. Hawley agrees to fund one-half of the settlement, Clarendon will waive its contribution rights vis-a-vis Mt. Hawley.

(First McPherson Decl., Ex. 13 [May 2, 2007 letter from Clarendon coverage counsel].) Mt. Hawley declined to increase its contribution, explaining that "Mt. Hawley . . . agreed to fund 50 percent of a settlement up to $200,000 based on its valuation of the case." (Second McPherson Decl., Ex. F [Aug. 5, 2007 letter from Mt. Hawley's counsel].)

On September 5, 2007, Mt. Hawley provided payment of $100,000. (Blau Decl., Ex. J [Sept. 5, 2007 correspondence attaching check].) On October 9, 2007, Clarendon provided payment of $180,000. (Morrow Decl., Ex. O [Oct. 9, 2007 correspondence attaching check].) This lawsuit followed.

## III. DISCUSSION

### A. LEGAL STANDARD

The Court reviews the competing motions to determine whether the relevant facts are undisputed or without substantial controversy and whether those facts allow the Court to enter judgment as a matter of law. Rule 56, Fed.R.Civ.P. If the record reveals the existence of factual issues genuinely in dispute because "they may reasonably be resolved in favor of either party" and that those issues might affect the outcome of a trial, the Court cannot grant summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In this case, because there are no disputed facts as to when DB completed work on the project which puts the claim outside of Clarendon's policy period, summary judgment is warranted.

### B. CLARENDON'S COVERAGE OBLIGATIONS

■ The threshold question in this case, which determines the maximum value of Clarendon's claim, is whether the damages arising from DB's alleged defective construction work was covered by the Clarendon CGL policy. That in turn depends on whether the damages at issue were caused by acts of DB that occurred within Clarendon's policy period. Based on the undisputed facts, and those without substantial controversy, the Court concludes as a matter of law that the defects at issue in this case occurred before Clarendon's CGL policy went into effect and that the damages at issue in this case were not covered by Clarendon's policy.

The only evidence even hinting that DB performed any work during the policy period are the change orders that persuaded Clarendon in the first instance to accept Mt. Hawley's tender. There are four change orders in issue:

> *Change Order No. 7*, dated August 22, 2000, for $224.95 relating to the patching and repair of second floor drywall for damage done by contractors
>
> *Change Order No. 8*, dated September 29, 2000, for $4,184.62 relating to "close off existing walls at the mezzanine per Architect's direction to create HVAC

plenum rooms. This area was not detailed on the plans."

*Change Order No. 9,* dated October 13, 2000, for $5,133.62 relating to providing labor and materials for extra work performed at St. Peter Chanel per superintendent's direction. Per our agreement, this covers all outstanding framing issues."

*Change Order No. 10,* dated October 16, 2000, for $3,465 relating to the elimination of a "back charge that was issued in Change Order No. 6."

(Sparhawk Decl., Ex. A.) The change order dates are within the Clarendon policy period, but the evidence indicates that the actual work was done before the policy went into effect. First, the daily job reports reflect that DB last performed work on the project on May 3, 2000, at which time, one employee working an 8 hour day performed "clean up" at the site. (Algorri Decl., Ex. A, at HOP 424.) Second, because the daily job reports reflect that *all work on the project* was completed in July 2000, the change orders, all of which are dated after the completion of all work, necessarily relate to work performed before project completion. Furthermore, conclusions drawn from the documents are supported by the project manager's testimony that he does not generate a subcontract change order until he receives complete information from the sub-contractor (which must include back-up documents, pricing information) and that it is common that change orders are submitted months after the additional work has been completed. (Sparhawk Decl. ¶¶ 3 et seq.) In short, the daily job reports together with Sparhawk's testimony conclusively demonstrate that the change orders relate to work performed on or before May 8, 2000, which was 33 days before June 10, 2008, the day the Clarendon CGL policy became effective. Finally, the Court notes that, even if the change orders related to work performed after June 2000, they all appear to relate to interior work and to adjustments to prior billing. Since the arbitration related to defects in the *exterior* drywall work (e.g., Sparhawk Decl., ¶ 3; Kavcioglu Decl., Ex. A, 3), none of which is referenced in the change orders, the daily job reports establish that the exterior work, which was the subject of the dispute, would have been completed by the first week in May.

From the foregoing discussion, the Court concludes that Clarendon has a claim for $180,000 since DB completed its work on the project before Clarendon's CGL became effective. The Court therefore turns to the remaining issue: whether Clarendon's agreement to pay costs of settlement constituted a waiver of its claim against Mt. Hawley.

### C. THE WAIVER/VOLUNTEER ISSUE

Clarendon became involved in this case because Mt. Hawley learned of the policy and made a demand that it participate in the defense and indemnification of the claim. Clarendon responded to the demand by agreeing to participate because it had been presented with the change orders whose dates suggested that its insured might have performed some of the allegedly defective work during its policy period. At the same time, Clarendon advised Mt. Hawley that it was accepting the tender subject to a reservation of all of its rights, and requested copies of all relevant documents, including "job file and lot file materials (e.g., contracts and change orders), relevant correspondence, and co-carrier information." (McPherson Decl., Ex. 11.)

What happened subsequently at the mediation, and the exact discussions that took place between Clarendon's and Mt. Hawley's counsel is not entirely clear. However, it is clear that Clarendon took issue with Mt. Hawley's refusal to contribute

more than $100,000 to the settlement and in correspondence immediately following the mediation Clarendon maintained its objection and reserved rights noting, in particular, that Clarendon may seek reimbursement of its entire contribution as Clarendon was still not sure as to whether the claim was covered under its policy. (First McPherson Decl., Ex. 13 [May 2, 2007 letter from Clarendon coverage counsel].) Even so, to insure that DB's interests were protected and the matter settled, Clarendon contributed $180,000 (more than half) toward the settlement of those claims that involved DB's work. Mt. Hawley now argues that even if the claim was not covered by Clarendon's policy—the conclusion reached herein—Clarendon waived any right to recover funds from Mt. Hawley by agreeing to the settlement at the time of the mediation and remitting funds thereafter.

Mt. Hawley premises its argument on the "volunteer" rule. (Clarendon MSJ Opp. at 1, 23–24; Mt. Hawley MSJ Mem. at 16–19.) Mt. Hawley relies on a case from the Texas Supreme Court for the proposition that "a co-insurer paying more than its contractually agreed-upon share does so voluntarily and cannot recover the excess from co-insurers." (Clarendon MSJ Opp. at 24 (citing *Mid–Continent Ins. Co. v. Liberty Mutual Ins. Co.*, 236 S.W.3d 765, 772 (2007).)) However, this case is not controlled by Texas law and the California cases relied on by Mt. Hawley do not prohibit Clarendon's recovery. *See e.g., Great Am. West, Inc. v. Safeco Ins. Co. of Am.*, 226 Cal.App.3d 1145, 1149 n. 4, 277 Cal.Rptr. 349 (1991) (noting, if not for statute of limitations issue, it would "be sufficient if Great American paid amounts for which Safeco was totally or jointly responsible in the reasonable belief it might also be responsible"); *Employers Ins. of Wausau v. Musick, Peeler, & Garrett*, 948 F.Supp. 942, 945 (S.D.Cal.1995) (declining to consider "argument that sub-

rogation may be asserted based on a claim, paid as a volunteer, but paid on a good faith belief that there might be coverage" because "payment in good faith was not a situation that applied").

California law plainly holds that an insurer does not become a volunteer and thereby waive its right to seek indemnification or contribution by participating in the settlement of a potentially covered claim. *See State Farm Fire and Casualty Co. v. Cooperative of American Physicians, Inc.*, 163 Cal.App.3d 199, 203–04, 209 Cal.Rptr. 251 (1984) (declining to find insurer volunteer where insurer defended action, settled claim, and then disputed coverage in separate action). Indeed, California appears to have abandoned the "volunteer rule." *See* Ed Espring et al., 39A *Cal. Jur.3d Insurance Contracts* § 610 (2008) ("'volunteer' rule has been declared dead") (footnote omitted); *Truck Ins. Exch. v. Unigard Ins. Co.*, 79 Cal. App.4th 966, 984, 94 Cal.Rptr.2d 516 (2000) (noting "demise of the broad volunteer rule") (citing cases). Accordingly, the fact that Clarendon may have provided payment while unsure of its obligation does not bar recovery once its obligation has been determined. *See Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App.4th 1279, 1289, 77 Cal.Rptr.2d 296 (1998) ("one insurer's settlement with the insured is not a bar to a separate action against that insurer by the other insurer or insurers for equitable contribution or indemnity"); *United Services Automobile Ass'n v. Alaska Ins.*, 94 Cal.App.4th 638, 644–45, 114 Cal.Rptr.2d 449 (2001) ("Equitable indemnity applies in cases in which one party pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the latter party.").

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Clarendon's motion for sum-

mary judgement and **DENIES** Mt. Hawley's cross-motion. Clarendon is entitled to equitable indemnification for its payment of $180,000. On or before October 20, 2008, Clarendon is to prepare and submit to the Court a proposed judgment consistent with this ruling.

IT IS SO ORDERED.