[No. D054522. Fourth Dist., Div. One. June 3, 2010.]

PENNSYLVANIA GENERAL INSURANCE COMPANY, Plaintiff and Appellant, v.
AMERICAN SAFETY INDEMNITY COMPANY, Defendant, Cross-complainant and Appellant;
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, Cross-defendant and Respondent.

1516

## Counsel

Wolkin Curran, Brandt L. Wolkin and Dawn A. Silberstein for Plaintiff and Appellant.

Blau & Associates, David S. Blau, David M. Morrow and James Whitemyer for Defendant, Cross-complainant and Appellant.

Branson, Brinkop, Griffith & Strong, John H. Podesta, John R. Campo and Geoffrey Hutchinson for Cross-defendant and Respondent.

## Opinion

**McDONALD, J.**—D. A. Whitacre Construction, Inc. (Whitacre), a framing subcontractor on a construction project, was insured under a commercial general liability (CGL) insurance policy issued by plaintiff Pennsylvania General Insurance Company (Pennsylvania General) for the period October 1998 through December 2001. While insured by Pennsylvania General, Whitacre entered into a subcontract to perform work on a project and completed that work. At the conclusion of Pennsylvania General's coverage period, and after Whitacre's work on the project was completed, Whitacre was insured by a CGL policy issued by defendant American Safety Indemnity Company (ASIC), for the period December 2001 through December 2002.[1]

In an ensuing construction defect lawsuit involving Whitacre (the construction defect litigation), various parties alleged that Whitacre's work on the project was improperly done and had created various problems with the project. Whitacre tendered its defense to both Pennsylvania General and ASIC. Pennsylvania General accepted Whitacre's tender of the defense under a reservation of rights and ultimately paid the defense and settlement costs for Whitacre. ASIC declined Whitacre's tender, asserting there was no possibility of coverage under its policy, and did not participate in defending or indemnifying Whitacre.

After the underlying construction defect litigation was settled, Pennsylvania General filed the present lawsuit against ASIC seeking equitable contribution from ASIC for a portion of the defense and indemnity costs paid by Pennsylvania General. The trial court, ruling on cross-motions for summary judgment, concluded ASIC had no responsibility to pay any portion of the

[1] ASIC provided Whitacre coverage for only one year. Thereafter, Whitacre was covered by a different CGL policy, issued by another insurer, that insured Whitacre for the period December 2002 through October 2005.

defense or indemnity costs because there was no potential coverage under ASIC's policy for the claims asserted against Whitacre in the construction defect litigation and entered summary judgment for ASIC. Pennsylvania General timely appealed.

I

FACTUAL BACKGROUND

### A. The Involved Entities

Whitacre was a framing subcontractor. Pennsylvania General insured Whitacre under a CGL policy for the period October 7, 1998, through December 31, 2001. ASIC insured Whitacre under a CGL policy for the period December 31, 2001, through December 31, 2002. National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National), a cross-defendant, insured Whitacre under a CGL policy for the period December 31, 2002, through October 1, 2005.

### B. The Project

In the summer of 1999 an entity known as "900 F Street Partners" (owners) retained GAFCON/Taylor Ball, Joint Venture (GAFCON) as general contractor for a construction project. In December 1999, GAFCON entered into a subcontract with Whitacre pursuant to which Whitacre agreed to provide framing and rough carpentry work for the project. Whitacre substantially completed its work by June 2001, although it performed some punch list work after June 2001. The final inspection notice for the entire project was issued in March 2002.

### C. The Third Party Lawsuits

In the construction defect litigation, involving a series of lawsuits commenced in April 2002 that ultimately consolidated, owners alleged there were numerous problems in the construction of the project. Among the claims asserted in the construction defect litigation was the allegation that Whitacre's work was deficient and had caused damage to the project.[2]

---

[2] Pennsylvania General and ASIC disputed whether the damages allegedly caused by Whitacre's work first manifested during Pennsylvania General's policy period. ASIC produced two letters from GAFCON's representative, written in the summer of 2001, informing Whitacre that the work performed by Whitacre was not acceptable, including concerns about ceiling deflection, walls that were not perpendicular to the floor, and window framing issues. However, Pennsylvania General presented evidence that these complaints were discussed between GAFCON and Whitacre and resolved because they agreed there was no damage to the

D. *The Defense and Settlement*

Whitacre tendered the defense of the construction defect litigation to numerous insurers, including Pennsylvania General and ASIC. Pennsylvania General accepted the tender of the defense for Whitacre as well as for GAFCON as an additional insured under the policy under a reservation of rights.[3] ASIC declined Whitacre's tender of the defense (as well as GAFCON's tender of the defense as an additional insured under the ASIC policy), asserting various provisions of its policy excluded coverage for the claims asserted in the construction defect litigation, including a "pre-existing damage" exclusion in ASIC's policy.

Pennsylvania General funded the defense of Whitacre and GAFCON in the construction defect litigation and paid about $780,000 as defense costs. Pennsylvania General and its assignor paid an additional $775,000 to settle the claims asserted in the construction defect litigation against its insureds.[4]

II

THE PRESENT ACTION

Pennsylvania General filed the present action seeking declaratory relief and equitable contribution from ASIC, asserting ASIC's policy provided coverage for some or all of the damages sought against Whitacre in the construction defect litigation and therefore ASIC should be required to contribute to the defense and settlement costs paid by Pennsylvania General. ASIC's answer denied its policy provided any potential for coverage and therefore asserted it owed no defense or indemnity obligations to Whitacre. ASIC filed a cross-complaint against a subsequent insurer (National) asserting that, if ASIC owed any obligation to share in the costs of defending and indemnifying Whitacre, it was entitled to equitable contribution from National as another insurer that also owed defense or indemnity obligations to Whitacre.

---

project from Whitacre's work. It therefore appears there is a factual dispute over whether damages attributable to Whitacre's work first manifested themselves prior to the inception of ASIC's policy.

[3] Pennsylvania General's reservation of rights letter noted various exclusions that potentially could eliminate coverage for the claims asserted against Whitacre, including questions about whether the damages sought in the construction defect litigation occurred during Pennsylvania General's policy period.

[4] Pennsylvania General funded $200,000 of the settlement. An excess insurer paid the remaining $575,000 of the settlement, and later assigned its rights to Pennsylvania General to seek recovery of all or part of that amount from ASIC.

All parties filed motions seeking summary judgment.[5] ASIC argued it was entitled to summary judgment because its policy covered only damages caused by an occurrence during the term of the policy, and expressly excluded coverage for any loss that first manifested before the term of its policy. ASIC argued that because its policy contained language eliminating any potential coverage under the "progressive damage-continuous trigger" of *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645 [42 Cal.Rptr.2d 324, 913 P.2d 878] (*Montrose*), it could not have an obligation to defend and indemnify Whitacre concurrent with any defense and indemnification by any prior insurer for Whitacre, and the absence of any possible concurrent obligation shared with Pennsylvania General precluded Pennsylvania General's claim for equitable contribution. Pennsylvania General opposed ASIC's motion, arguing that because there was *potential* coverage under both ASIC's policy and Pennsylvania General's policy, it was entitled to contribution from ASIC for the defense costs and was presumptively entitled to contribution for the settlement costs.

Pennsylvania General's cross-motion for summary judgment interposed the same arguments: there was at least a potential for coverage under ASIC's policy for the claims asserted in the construction defect litigation; this potential coverage entitled Pennsylvania General (as another insurer that honored its obligation to provide a defense to Whitacre) to require ASIC to contribute to the defense costs under equitable contribution principles; and ASIC was presumptively liable to contribute to the settlement costs. ASIC's opposition to Pennsylvania General's motion asserted there was no potential for coverage under its policy, and therefore no duty to defend or indemnify, because ASIC's policy contained language excluding coverage for any occurrence that happened before the effective date of its policy. ASIC argued the term "occurrence" employed in ASIC's policy expressly and unambiguously referred to the underlying conduct that caused the resulting damage, rather than to the damage resulting from that conduct, and it was undisputed Whitacre's conduct was completed before the effective date of ASIC's policy. ASIC therefore argued there was no potential for coverage under ASIC's policy, regardless of when the damage resulting from Whitacre's conduct may have occurred, because all of Whitacre's work (the causal conduct) was completed prior to ASIC's policy period; ASIC's definition of "occurrence" did not suggest damage resulting from that conduct was germane to determining *when* there was an occurrence.

---

[5] Although the dispositive rulings on the various motions for summary judgment involved the motions made by Pennsylvania General and ASIC, National also moved for and obtained summary judgment in its favor. However, the order granting National's summary judgment motion was premised on the foundational ruling that, because ASIC was not liable to Pennsylvania General for contribution, ASIC could not establish the elements of a claim for contribution against National.

The trial court granted ASIC's motion for summary judgment and denied Pennsylvania General's motion for summary judgment, concluding ASIC's policy excluded coverage for the claims asserted against Whitacre in the construction defect litigation because Whitacre's work was completed before the inception of ASIC's policy. The trial court reasoned that under ASIC's CGL policy: "The terms 'occurrence' and 'property damage' are distinctly defined and are not synonymous. In evaluating the trigger of coverage in the policies, there are two separate triggers, 'occurrence' and 'property damage' which are not the same, in light of the fact that 'property damage' is caused by an 'occurrence.' [Citations.] An occurrence is a causal event. [Citation.] [¶] . . . [ASIC's] policy requires that . . . the occurrence [both] . . . 'happen during the term of the insurance' . . . and cause property damage during the policy period. It also excludes a prior 'occurrence' . . . . [¶] . . . [¶] In the context of the underlying action, the Court finds that the 'occurrence' (the act causing the injury/damage), here the defective framing work performed by Whitacre, could arise no later than the time Whitacre's framing work on the project was completed. The undisputed evidence establishes that Whitacre's work was completed by June of 2001. . . . Therefore, the evidence establishes that the 'occurrence' commenced during [Pennsylvania General's] policy period, which was prior to the inception of [ASIC's] policy."

The trial court therefore entered summary judgment in favor of ASIC, and against Pennsylvania General.[6]

---

[6] The court also granted National's motion for summary judgment against ASIC. ASIC's claim against National for equitable contribution was dependent on the predicate determination that ASIC was liable to Pennsylvania General for some portion of the defense and/or settlement costs. Accordingly, after the court determined ASIC was not liable to Pennsylvania General, it determined ASIC could not maintain any claim against National, and therefore granted National's motion for summary judgment. Considering our determination that summary judgment in favor of ASIC was error, we must reverse the order in favor of National and remand for further proceedings on ASIC's cross-complaint against National. (Cf. *Pfeiffer Venice Properties v. Bernard* (2002) 101 Cal.App.4th 211, 219 [123 Cal.Rptr.2d 647].) Nothing in this opinion should be construed as resolving any of the substantive contentions arising out of ASIC's claims against National.

Additionally, we note that in the present appeal Pennsylvania General argues (and ASIC disputes) ASIC also is liable for contribution insofar as Pennsylvania General paid to defend and indemnify GAFCON as an additional insured. Although that claim was raised by Pennsylvania General in its summary judgment motion, it was not among the issues resolved by the trial court in connection with the ruling on ASIC's summary judgment motion, which is the only ruling before us in the current appeal. Accordingly, we express no opinion on this issue.

## III

## APPLICABLE LEGAL PRINCIPLES

### A. *Standard of Review*

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; see *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) "[W]e exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' [Citation.] '. . . [W]e construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it.' " (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201–1202 [119 Cal.Rptr.2d 160].)

### B. *Interpreting Insurance Contracts*

The order granting summary judgment turned principally on the trial court's interpretation of ASIC's CGL policy. The legal principles applicable to interpreting insurance policies, which we apply de novo on appeal (*Standard Fire Ins. Co. v. Spectrum Community Assn.* (2006) 141 Cal.App.4th 1117, 1124 [46 Cal.Rptr.3d 804]), are established. The Supreme Court in *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390–391 [33 Cal.Rptr.3d 562, 118 P.3d 589] summarized those principles as follows:

" 'When determining whether a particular policy provides a potential for coverage . . . , we are guided by the principle that interpretation of an insurance policy is a question of law. [Citation.]' [Citation.] [¶] 'The insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there is no coverage. [Citation.] We apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy.' [Citations.]

■ "In reviewing de novo a superior court's summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts. We reiterated those rules in our decision in

[*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 [77 Cal.Rptr.2d 107, 959 P.2d 265]]: [¶] ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citations.] "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit, it governs." [Citation.]' [(Quoting *Foster-Gardner, supra,* at p. 868.)]

■ " ' "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does "[d]isagreement concerning the meaning of a phrase," or " 'the fact that a word or phrase isolated from its context is susceptible of more than one meaning.' " [Citation.] " '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " [Citation.] "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." [Citation.]' [(Quoting *Foster-Gardner, supra,* 18 Cal.4th at p. 868.)] [¶] . . . [S]tandard form policy provisions are interpreted under the same rules of construction. ' "[W]hen they are examined solely on a form, i.e., apart from any actual agreement between a given insurer and a given insured, the rules stated above apply *mutatis mutandis.* That is to say, where it is clear, the language must be read accordingly, and where it is not, in the sense that satisfies the hypothetical insured's objectively reasonable expectations." ' "

### C. *The Relevant Policy Provisions*

Because our analysis begins with an examination of the relevant policy provisions, rather than general rules that may not necessarily be responsive to the policy language (*Harbor Ins. Co. v. Central National Ins. Co.* (1985) 165 Cal.App.3d 1029, 1034–1035 [211 Cal.Rptr. 902]), we examine the language employed by ASIC in its CGL policy.

ASIC's CGL policy provided it would indemnify Whitacre for any amount Whitacre became obligated to pay as " 'property damage' to which this insurance applies," and specified that "[t]his insurance applies to . . . 'property damage' only if: [¶] (1) The . . . 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and [¶] (2) The . . .

'property damage' occurs during the policy period." (CGL policy, § I, coverage A, ¶ 1(a) & (b).) ASIC's CGL policy provided a "per occurrence" limit of $1 million, and provided a "Products/Completed Operations" aggregate limit of $1 million.

ASIC's CGL policy also contained two 1999 endorsements that modified the standard policy provisions. The standard definition of "occurrence" contained in the 1997 version of the CGL policy[7] was replaced by ASIC's 1999 endorsement that refined the definition of "occurrence" by adding the following italicized language: " 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions *that happens during the term of this insurance. 'Property damage' . . . which commenced prior to the effective date of this insurance will be deemed to have happened prior to, and not during, the term of this insurance.*" (Italics added.)

At the same time, ASIC added another 1999 endorsement, entitled "PRE-EXISTING INJURY OR DAMAGE EXCLUSION," which stated: "This insurance does not apply to: [¶] 1. Any 'occurrence', incident or 'suit' . . . [¶] [(a)] which first occurred prior to the inception date of this policy . . . ; or [¶] [(b)] which is, or is alleged to be, in the process of occurring as of the inception date of this policy . . . even if the 'occurrence' continues during this policy period."

## D. *Analysis of Summary Judgment Order*

The pivotal issue is whether the terms of ASIC's CGL policy clearly and unambiguously provide that two separate "triggers of coverage"[8]—i.e., the causal acts by Whitacre and the commencement of damages resulting from those acts—must happen during the effective date of the policy before a potential for coverage exists. ASIC's interpretation of its CGL policy rests on the assertion that its CGL policy distinctly defined (and differentiated between) the terms "occurrence" and "property damage" and did not incorporate property damage as a defining characteristic of an "occurrence." ASIC argues there are therefore two separate triggers of coverage—an "occurrence" and "property damage"—and the former is the causal event or conduct that

---

[7] The 1997 version of ASIC's CGL policy defined "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

[8] " '[T]rigger of coverage' is a term of convenience used to describe that which, under the specific terms of an insurance policy, must happen in the policy period in order for the *potential* of coverage to arise. The issue is largely one of timing—what must take place *within the policy's effective dates* for the potential of coverage to be 'triggered'?" (*Montrose, supra,* 10 Cal.4th at p. 655, fn. 2.)

produced the latter. Accordingly, ASIC asserts that because the 1999 endorsement requires the occurrence to have "happen[ed] during the term of th[e] insurance" as well as to have caused property damage during the policy period, there was no potential for coverage because the undisputed facts show Whitacre's causal conduct did not happen during the term of ASIC's policy. Because the trial court's ruling was premised on its determination that ASIC's CGL policy required the causal acts to happen during the policy period, our focus is on that determination.[9]

■ The courts have repeatedly confronted insurance policies that have insured against an occurrence and that employed language defining the term "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." In a series of cases, those courts have concluded that "the time of occurrence of an accident within the meaning of an insurance policy is the time the complaining party was damaged, not the time the wrongful act was committed." (*Hallmark Ins. Co. v. Superior Court* (1988) 201 Cal.App.3d 1014, 1018 [247 Cal.Rptr. 638]; accord, *Remmer v. Glens Falls Indem. Co.* (1956) 140 Cal.App.2d 84, 88 [295 P.2d 19]; *Standard Fire Ins. Co. v. Spectrum Community Assn., supra,* 141 Cal.App.4th at p. 1127.) Accordingly, the ordinary trigger of coverage would focus on when *damage* was inflicted, not on when the *causal acts* were committed, and we must determine whether ASIC's addition of the italicized language to its policy definition of "occurrence" (as something that *"happens during the term of this insurance. 'Property damage' . . . which commenced prior to the effective date of this insurance will be deemed to have happened prior to, and not during, the term of this insurance"*) unambiguously altered the ordinary trigger of coverage by requiring the causal acts to be committed (as well as the resulting damage to first arise) during the policy period.

■ We conclude ASIC's CGL policy, read as a whole, remains reasonably susceptible of the interpretation that resulting damage, not the causal conduct, is still a defining characteristic of the occurrence that must take place during the policy period to create coverage. When construing an insurance policy, we must resolve ambiguities in coverage clauses most

---

[9] The trial court also stated in its ruling that Pennsylvania General's April 13, 2005, reservation of rights letter, by which Pennsylvania General accepted Whitacre's tender of the defense, "likewise supports that there was an 'occurrence' during [Pennsylvania General's] policy period," which necessarily excluded coverage under ASIC's 1999 "PRE-EXISTING INJURY OR DAMAGE EXCLUSION." On appeal, however, Pennsylvania General persuasively argues the statements in its reservation of rights letter were not an admission that there was in fact an occurrence for purposes of the trigger to coverage and, indeed, the letter specifically reserved its right to contest whether there was coverage. ASIC acknowledges the trial court's mention of the reservation of rights letter was incidental, and its ruling was not dependent on the letter. We agree this letter appears to be collateral to the central inquiry and therefore do not further consider this letter or the trial court's incidental reliance on it.

broadly in favor of coverage, and we concomitantly must narrowly construe exclusions and limitations on coverage. (*Atlantic Mutual Ins. Co. v. Ruiz* (2004) 123 Cal.App.4th 1197, 1208 [20 Cal.Rptr.3d 628].) A policy provision is ambiguous when it is capable of two or more constructions, both of which are reasonable. (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) Here, the 1999 endorsement adding the italicized language to the definition of "occurrence" does not clearly and unambiguously limit coverage to those claims in which the causal acts took place during the policy period. (See *Smith Kandal Real Estate v. Continental Casualty Co.* (1998) 67 Cal.App.4th 406, 414 [79 Cal.Rptr.2d 52] [although insurer may select risks it will insure "an exclusion or limitation on coverage must be clearly stated and will be strictly construed against the insurer. If an exclusion ambiguously lends itself to two or more reasonable constructions, the ambiguity will be resolved against the insurer and in favor of coverage."].) The italicized language read as a whole (see *Industrial Indemnity Co. v. Apple Computer, Inc.* (1999) 79 Cal.App.4th 817, 826 [95 Cal.Rptr.2d 528]) is at least equally susceptible of the interpretation that resulting damage is the defining characteristic of the occurrence. The newly added language, after stating that the occurrence must "happen[] during the term of this insurance," then immediately expands upon and refines the definition by explaining what would be deemed *not* to have constituted an " '[o]ccurrence' . . . that happens during the term of this insurance." The endorsement explains that " '[p]roperty damage' . . . which commenced prior to the effective date of this insurance will be deemed to have happened prior to, and not during, the term of this insurance." (Italics added.) Thus, the newly minted language of the 1999 endorsement lends itself to the interpretation that what must occur to qualify as an occurrence *is* property damage during the term of the policy, and there is nothing in the newly minted 1999 language clearly stating the causal conduct must *also* occur during the policy period.

Additionally, ASIC's other 1999 endorsement buttresses the interpretation that ASIC's CGL policy employed the term "occurrence" to refer to the damage, not to the causal acts that produced the damage. ASIC's other 1999 endorsement states the insurance would not apply to "[a]ny 'occurrence' . . . [¶] . . . which first occurred prior to the inception date of this policy . . . ; or [¶] . . . which is, or is alleged to be, in the process of occurring as of the inception date of this policy . . . even if the 'occurrence' continues during this policy period." That language is found under the heading "PRE-EXISTING INJURY OR DAMAGE EXCLUSION," *not* "Pre-Existing Causal Conduct Exclusion," which supports the interpretation that the term "occurrence" (and that which ASIC will exclude from coverage if it first happened before the inception date of ASIC's policy) refers to the "injury or damage" resulting from the conduct, not the causal conduct itself.

ASIC argues, however, that (1) its policy language clearly differentiates between the concept of "occurrence" and the property damage resulting from the occurrence, and (2) courts have construed the term "occurrence" as referring to the underlying causal conduct rather than the resulting property damage. From these predicates, ASIC asserts that its 1999 endorsement, by employing language that required the occurrence to "happen[] during the term of this insurance," clearly and unambiguously excludes coverage where the causal conduct takes place before the inception of the policy regardless of when the resulting damage first occurs. We are not persuaded by either ASIC's policy language argument or by the case law relied on by ASIC.

ASIC's policy language argument rests on its quote from the policy stating that the insurance applies to property damage only if the " 'property damage' is caused by an 'occurrence.' "[10] This partial quote from the policy, ASIC asserts, demonstrates that property damage is separate from and not an element of the definition of an occurrence. However, ASIC's interpretation rests on a partial quote that has been shorn from the language (represented by the italics) explaining that its CGL has *territorial* limitations. The full quote—that the insurance only applies to " 'property damage' . . . caused by an 'occurrence' *that takes place in the 'coverage territory'* " (CGL policy, § I, coverage A, ¶ 1(a) & (b), italics added)—is at least equally susceptible of the interpretation that the quoted language was designed to impose territorial requirements on coverage (e.g., that the insurance only applies to " 'property damage' . . . that takes place in the 'coverage territory' "), and was not designed to redefine the term "occurrence" as limited to the causal conduct leading to the covered damage.

■ ASIC's case law argument is also unconvincing. ASIC cites several cases, including *EOTT Energy Corp. v. Storebrand Internat. Ins. Co.* (1996) 45 Cal.App.4th 565 [52 Cal.Rptr.2d 894] and *Chemstar, Inc. v. Liberty Mut. Ins. Co.* (C.D.Cal. 1992) 797 F.Supp. 1541, for the proposition that an insurance policy's use of the term " '[o]ccurrence' refers to the underlying cause of injury, rather than the injury or claim itself." (*Travelers Cas. and Sur. Co. v. American Internat. Surplus Lines Ins. Co.* (S.D.Cal. 2006) 465 F.Supp.2d 1005, 1020 [relying on *Whittaker Corp. v. Allianz*

---

[10] ASIC's appellate brief, in an apparent attempt to buttress its contention that the occurrence is necessarily used to denote the causal conduct and not the distinct issue of the resulting damage, also appears to argue ASIC's CGL policy also uses the phrase "occurrence giving rise to the property damage." However, ASIC has not directed this court to the portion of the policy containing this phraseology, and we therefore do not further examine this aspect of ASIC's appellate argument. (*Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 928 [59 Cal.Rptr.3d 37] ["A party on appeal has the duty to support the arguments in the briefs by appropriate reference to the record, which includes providing exact page citations. We have no duty to search the record for evidence and may disregard any factual contention not supported by proper citations to the record."].)

*Underwriters, Inc.* (1992) 11 Cal.App.4th 1236 [14 Cal.Rptr.2d 659]].) However, the cited cases address the distinct question of how to construe the term "occurrence" in the context of determining how to apply the policy's "per occurrence limits" (*Chemstar,* at p. 1546) or a policy's per occurrence deductibles (see *EOTT Energy Corp.,* at pp. 574–578; cf. *Travelers,* at p. 1020 [construing occurrence for purposes of self-insured retention]), not in the context of determining (as here) whether the trigger of coverage had happened within the policy period. In *Whittaker Corp.,* the court explained that although the courts had applied divergent interpretations to the term "occurrence" (i.e., as meaning when the damage happened rather than when the causal conduct happened), those interpretations were not inconsistent, because the term "occurrence" can involve "two distinct questions. The issue here is whether there was a covered injury within the policy period [and the insured] erroneously attempts to apply case law relating to the 'per occurrence' limitation of liability for a covered injury. [¶] . . . [¶] For the purpose of determining whether there was *coverage within the policy period,* it is well established that the time of the relevant 'occurrence' or 'accident' is not when the wrongful act was committed but when the complaining party was actually damaged. [Citations.] . . . [¶] [The insured] misplaces reliance upon cases interpreting 'occurrence' for the purpose of an insurer's *limitation of liability to a certain amount for each covered occurrence.* For *that* purpose, occurrence has generally been held to mean the underlying cause of the injury, rather than the injury or claim itself; otherwise, the insurer's effort to limit its liability per occurrence would be substantially weakened. [¶] The *number* of relevant occurrences for the purpose of interpreting the per occurrence limitation of liability is different from the question of *when* the relevant occurrence happens for the purpose of determining if there is coverage at all, or whether coverage should be allocated to a particular policy period. . . . [¶] . . . *Appalachian Ins. Co.* v. *Liberty Mut. Ins. Co.* [(3d Cir. 1982) 676 F.2d 56, 61–62] also explains this distinction. For the purpose of interpreting the per occurrence $25,000 deductible, the court looked to the underlying proximate cause. [Citation.] ▆ For the distinct purpose, however, of determining whether the occurrence took place within the policy period, the court said, '[w]hile the "cause" test is appropriate for determining whether there is a single occurrence or multiple occurrences, it is not applicable in determining when an occurrence takes place. We hold that the determination of when an occurrence happens must be made by reference to the time when the injurious effects of the occurrence took place. "There can be no question but that the aspect of the occurrence which must take place within the policy period . . . is the 'result,' that is, the time when the accident or injurious exposure produces personal injury." ' (*Id.* at pp. 61–62.)" (*Whittaker Corp.* v. *Allianz Underwriters, Inc., supra,* 11 Cal.App.4th at pp. 1241–1243, fns. omitted.)

The reasoning of *Whittaker*, as well as numerous other cases (see, e.g., *Michigan Chemical Corp. v. American Home Assur. Co.* (6th Cir. 1984) 728 F.2d 374, 379), persuades us that the fact some courts (addressing different issues) have interpreted the term "occurrence" to focus on the causal conduct is irrelevant to the distinct question presented here—whether the "occurrence," which must happen during the policy year to trigger coverage under ASIC's policy, is the first manifestation of damage rather than Whitacre's causal conduct. Accordingly, ASIC's cited cases do not control whether the term "occurrence" in ASIC's policy refers to causal conduct rather than to the resulting damage.[11]

ASIC cites one case—*USF Ins. Co. v. Clarendon America Ins. Co.* (C.D.Cal. 2006) 452 F.Supp.2d 972 (*USF*)—that appears to state the term "occurrence" as used in the insurer's policy should be construed to require the insured's causal conduct (not the resulting damage to the project) to happen during the term of the policy to trigger coverage.[12] However, we are unconvinced *USF* supports the trial court's order in this case. In *USF*, an insurer under a CGL policy filed suit seeking contribution from another insurer, Clarendon, alleging Clarendon had wrongfully refused to participate in defense and indemnity of the insured contractor in the underlying suit by homeowners for damages resulting from alleged construction defects. Clarendon's policies contained language analogous to that of ASIC's policy.[13] The plaintiff insurer asserted Clarendon had a duty both to participate in the defense and to contribute to indemnifying the insured. (*USF, supra*, 452 F.Supp.2d at pp. 983–984.)

[11] One of the cases cited by ASIC as supporting its interpretative gloss on the term "occurrence," *Chemstar, Inc. v. Liberty Mut. Ins. Co., supra*, 797 F.Supp. 1541, itself recognized that "defining 'occurrence' for the purpose of applying per occurrence limits on [liability] [r]ather [than] determining whether property damage 'occurred' during the policy periods of one or more insurers, thus triggering liability[,] . . . are two distinct questions to which different rules apply." (*Id.* at p. 1547, fn. 11.)

[12] ASIC cites a second case, *Clarendon America Ins. Co. v. Mt. Hawley Ins. Co.* (C.D.Cal. 2008) 588 F.Supp.2d 1101, in which the court stated that the "threshold question . . . is whether the damages arising from DB's alleged defective construction work [were] covered by the Clarendon CGL policy. That in turn depends on whether the damages at issue were caused by acts of DB that occurred within Clarendon's policy period." (*Id.* at p. 1104.) However, that case does not quote the policy language the court construed when it concluded the policy required the causal acts to happen during the policy period, and is therefore not helpful in this case. In ASIC's supplemental briefing, it cites a second case (*PMA Capital Ins. Co. v. American Safety Indem. Co.* (E.D.Cal. 2010) 695 F.Supp.2d 1124) to support its argument. Although the trial court in *PMA* appears to have accepted an argument analogous to that asserted by ASIC here, it is unclear whether the trial court was required to evaluate arguments similar to those raised by Pennsylvania General in this case, and we are unpersuaded by the opinion in *PMA*.

[13] Clarendon's policy required that the property damage " 'caused by an occurrence which takes place in the coverage territory,' " was " 'caused by an occurrence which takes place

The *USF* court first noted Clarendon's policies contained language conditioning coverage on the requirements that the property damage be caused by an occurrence " 'which takes place during the policy period' " and that the property damage resulting from such occurrence " 'first take[] place during the policy period.' " (*USF, supra,* 452 F.Supp.2d at p. 982.) Importantly, the *USF* court noted Clarendon's policies *also* contained a " 'deemer clause' " providing that, " 'All property damage or bodily injury arising from, caused by or contributed to by, or in consequence of an occurrence shall be deemed to take place at the time of the first such damage, even though the nature and extent of such damage or injury may change and even though the damage may be continuous, progressive, cumulative, changing or evolving . . . .' " (*USF, supra,* 452 F.Supp.2d at p. 987.) Clarendon argued it was clear under these coverage provisions that "occurrence" was not synonymous with "property damage" and that it referred to the cause of the property damage, which was the insured's purportedly negligent work or the exposure of its work to the elements, both of which happened before the inception of Clarendon's policy. Clarendon also argued it was clear the property damage caused by the insured's defective work first occurred before the inception of the policies. Accordingly, Clarendon argued it had no indemnity obligation because neither the accident constituting the occurrence nor the first instance of property damage caused by the occurrence took place within the policy periods. (*Id.* at pp. 987–988.)

Although the *USF* court did state that the language of the Clarendon policies "make[s] a clear distinction between the 'occurrence,' which is the accident or exposure that *causes* damage to the claimant, and the resulting 'physical damage' " (*USF, supra,* 452 F.Supp.2d at p. 989), this statement was dicta because the *USF* court held Clarendon had no indemnity obligation because of *when the damages first manifested.* In *USF*, the plaintiff argued that because the damage was ongoing during the term of Clarendon's policies, Clarendon provided coverage under *Montrose*'s "continuous trigger." Rejecting that argument, the *USF* court noted Clarendon's policies "contain contractual language that is different than that of the policies at issue in [*Montrose*]. In fact, as USF concedes, the coverage terms of defendants' Policies were revised in 1996 to 'circumvent the continuous injury trigger of the coverage rule laid down' in [*Montrose*]." (*USF,* at p. 989.) Thus, the *USF* court held there was no indemnity obligation because the damages first manifested themselves before the inception of the Clarendon policies, *not* because the causal acts occurred before the inception of those policies. (*USF,* at pp. 990–991.)

---

during the policy period,' " and that the " 'property damage resulting from such occurrence first takes place during the policy period.' " (*USF, supra,* 452 F.Supp.2d at p. 982, boldface omitted.)

Additionally, we note the *USF* decision undermines ASIC's arguments on a different issue involved in this action: equitable contribution for the defense costs. Although the *USF* court concluded there was no indemnity obligation (because it was undisputed damage first occurred before the inception of the Clarendon policies) it nevertheless concluded that, " 'at the time of tender, . . . the Underlying Action did, in fact, present the possibility of damage within the coverage grant.' " (*USF, supra,* 452 F.Supp.2d at p. 994.) Because there was a potential for coverage, giving rise to a duty by Clarendon to defend the insured, the plaintiff insurer was entitled to seek equitable contribution for the defense costs. (*Id.* at pp. 994–1005.)

We agree with the *USF* court insofar as it concluded the proper interpretation of the language employed in ASIC's policy is that it was designed to " 'circumvent the continuous injury trigger of the coverage rule laid down' in [*Montrose*]." (*USF, supra,* 452 F.Supp.2d at p. 989.) However, that construction means the appropriate focus for an occurrence is on *when the damages caused by the negligent causal acts of the insured first commenced,* and is *not* on when the insured completed its work. Here, the facts were disputed on when those damages first commenced (see fns. 2 & 3, *ante*) and the trial court's entry of summary judgment in favor of ASIC was based solely on its conclusion that there was no potential for coverage because Whitacre's causal acts happened before the inception of ASIC's policy. We conclude, however, the policy was reasonably susceptible of the interpretation that the trigger of coverage was not when the insured completed its work, but was instead based on when the damages caused by the negligent causal acts of the insured first commenced.

Our construction—that a reasonable insured could conclude the purpose and effect of ASIC's 1999 policy endorsements was to obviate *Montrose*'s continuous trigger approach rather than to exclude coverage if the injury-producing conduct preceded the inception of the policy—is reinforced when considering the coverage afforded by ASIC's policy under the so-called "products-completed operations hazard." (Cf. *Prudential Ins. Co. of America, Inc. v. Superior Court* (2002) 98 Cal.App.4th 585, 598–599 [119 Cal.Rptr.2d 823] [interpretation of insurance policy focuses on language of policy as a layperson would understand it and provisions of policy must be construed within the context of the policy as a whole].) ASIC's products-completed operations hazard appears to employ standard language to promise the insured coverage against claims for property damage "arising out of . . . 'your work' except [for] [¶] . . . [¶] [w]ork that has not yet been completed . . . ." This type of coverage ordinarily is conditioned on damage occurring during the policy period, as long as the work was completed before the damage occurred, and is not conditioned on *when* the work was completed. (See 3 Cal. Insurance Law & Practice (2010) Construction Insurance, § 37.05[7], pp. 37-19 to 37-20 (rel. 66-12/2009); Croskey et al., Cal. Practice Guide:

Insurance Litigation (The Rutter Group 2009) ¶¶ 7:1428 to 7:1432, pp. 7E-24 to 7E-25 (rev. # 1, 2008).) The protection provided by this products-completed operations hazard appears to require three conditions: there was property damage, it arose "out of . . . 'your work,' " and " 'your work' " has been completed. There is certainly nothing in the products-completed operations hazard that suggests the second element—the insured's work caused the damage—was itself subject to a *fourth* condition that the insured's work happened during the policy period. Although ASIC argues this fourth condition (the insured's injury-causing work happened during the policy period) was clearly and unambiguously contained in ASIC's 1999 endorsement that refined the definition of "occurrence," as well as by its 1999 "PRE-EXISTING INJURY OR DAMAGE EXCLUSION" endorsement, we are not persuaded by ASIC's argument. Prior to the addition of ASIC's 1999 endorsements, ASIC's CGL provided separate definitions for the term "occurrence" (§ V., par. 13) and the term "your work" (§ V., par. 21). The 1999 endorsement, which refined the definition of "occurrence" as requiring the occurrence to "happen[] during the term of this insurance," did *not* similarly amend the definition of "your work" as requiring such work also "happen[] during the term of this insurance." Similarly, the "PRE-EXISTING INJURY OR DAMAGE EXCLUSION," which stated ASIC's insurance would not apply to any " 'occurrence' . . . [¶] . . . which first occurred prior to the inception date of this policy," did not similarly state ASIC's CGL policy would not apply to any injury-producing "work" that happened prior to the inception date of this policy. The 1999 amendments to ASIC's policy do not clearly and unambiguously add, as a fourth condition to the protection provided under the products-completed operations hazard, the requirement that "your work" must have happened during the policy period.

ASIC's proffered construction—that the terms "occurrence" and "your work" should be treated as synonymous and therefore as being simultaneously amended by the 1999 endorsements—ignores that the original policy separately defined and employed those terms. However, the interpretation we adopt—the term "occurrence" refers to the damage and the term "your work" refers to the conduct that produced the injury—harmonizes and gives effect to how a reasonable insured could read ASIC's CGL policy provisions as modified by the 1999 endorsements: under the CGL policy provisions, the products-completed operations hazard protected against claims for property damages "arising out of . . . 'your work' " once that work was completed, regardless of when that work was completed, as long as (under the 1999 endorsements) the property damage (or occurrence) "happens during the term of this insurance" but cautioning " '[p]roperty damage' . . . which commenced prior to the effective date of this insurance will be deemed to have happened prior to, and not during, the term of this insurance."

### E. *Conclusion*

██ We conclude that ASIC's CGL policy is reasonably susceptible of the interpretation that the trigger of coverage was damage to property, not the causal conduct, and the 1999 endorsements were merely designed to obviate the application of the "progressive damage-continuous trigger" articulated in *Montrose*. As we have previously noted, the facts here were disputed on when the damages sought in the construction defect litigation first commenced. Accordingly, it was error to grant summary judgment in ASIC's favor insofar as Pennsylvania General sought contribution for the indemnity payments, and it was also error to grant summary judgment in ASIC's favor insofar as the Pennsylvania General action sought equitable contribution for the defense costs paid in the underlying action.

## DISPOSITION

The judgment is reversed. Pennsylvania General is entitled to its costs on appeal against ASIC. ASIC and National shall bear their own costs on appeal.

Benke, Acting P. J., and Irion, J., concurred.

A petition for a rehearing was denied June 18, 2010, and the petition of appellant American Safety Indemnity Company for review by the Supreme Court was denied October 27, 2010, S185204. Corrigan, J., did not participate therein.