Filed 3/1/19

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, | B283684 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC587563) |
| v. | |
| AMERICAN SAFETY INDEMNITY COMPANY, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County.  Gregory Wilson Alarcon, Judge.  Affirmed.

Chamberlin & Keaster, Robert W. Keaster and Michael A. Miller for Defendant and Appellant.

Herold & Sager, Andrew D. Herold, Michael D. Douglas and Brooke M. Finley for Plaintiff and Respondent.

———————————————

**SUMMARY**

This is a dispute between insurers. Under Insurance Code section 11580 (section 11580), when a judgment is obtained against an insured based upon property damage, the judgment creditor may bring an action on the policy against the insurer, to recover on the judgment. Here, plaintiff's insured (a general contractor) secured a default judgment against defendant's insured (a subcontractor), after a homeowner obtained an arbitration award of more than $1.1 million against the general contractor.

Plaintiff indemnified the general contractor for the arbitration award. Defendant refused to indemnify the subcontractor for the amount of the default judgment. In this lawsuit, plaintiff (as subrogee of its insured) sought recovery from defendant under section 11580 of the amount of the default judgment against the subcontractor.

Both parties filed summary judgment motions, and the trial court granted summary judgment for plaintiff. Defendant appeals on three principal bases. Defendant contends the default judgment was void because the underlying complaint failed to specify the amount of damages sought. (Code Civ. Proc., § 580.) Defendant further contends the default judgment was an award for economic loss rather than property damage, and therefore not recoverable under section 11580. And, defendant contends plaintiff did not prove the default judgment was covered under any of defendant's policies. Defendant also raises other points not presented to the trial court before it granted summary judgment.

We find no merit in defendant's principal contentions, and do not consider claims not presented to the trial court until after

it heard and ruled on the summary judgment motions. Accordingly, we affirm the judgment.

## FACTS

### 1. The Parties and the Background

Plaintiff is The Insurance Company of the State of Pennsylvania. Plaintiff was the excess liability insurer for New Millennium Homes LLC and NM Homes One, Inc. (collectively, NMH).[1] NMH was the builder and developer of a housing development in Calabasas. Amir and Brenda Moghadam bought one of the homes from NMH in December 2005 (the Moghadam property).

Defendant is American Safety Indemnity Company. Defendant was the commercial general liability insurer for Camarillo Engineering, Inc. (Camarillo). Defendant issued six different policies to Camarillo covering annual periods that began on December 1, 2003, and ended on August 1, 2009. Each of the policies provides that defendant will pay "those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." Property damage is defined as "[p]hysical injury to tangible

---

[1] Plaintiff issued NMH a "follow form excess liability policy" that was subject to the same warranties, terms and conditions as the underlying coverage. The underlying commercial general liability policy was issued by Everest Indemnity Insurance to NMH. One of its provisions was that "[i]f the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring 'suit' or transfer those rights to us and help us enforce them."

3

property, including all resulting loss of use of that property."[2] The insurance applies to property damage if it is "caused by an 'occurrence' that takes place in the 'coverage territory' " and if the property damage "occurs during the policy period."

In 2004, Camarillo performed "mass grading, compacting, and finish grading" of the soils at the Moghadam property under a November 2004 subcontract with NMH. The subcontract required Camarillo to indemnify and hold NMH harmless from claims (including attorney fees "incurred as a result thereof") for property damage "arising out of or resulting from the activities of or work performed" by Camarillo.

In early 2009, the Moghadams " 'began to notice drywall and stucco cracks, separation and cracking of interior tiles, and lifting of exterior flagstones' " on their property. They complained to NMH " '[i]n approximately May 2009.' " An ensuing geotechnical investigation found the distress to the Moghadam residence was due to " 'differential fill settlement, as well as expansive soil activity,' " and that "an inadequate design and construction of the post-tension slab foundation system are exacerbating the distress." A construction engineer hired to prepare a repair estimate concluded the entire structure was compromised and should be demolished and rebuilt at a cost of almost $1.9 million.

---

[2]     The full definition of "property damage" is: "a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or  [¶]  b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

4

In September 2011, the Moghadams filed a claim in arbitration against NMH for defective construction, alleging their total current damages were "at least $2,347,592." Their claim alleged most of the stress features (the cracks and separations mentioned above) had occurred on the southeastern portion of the house, where the fill was deepest. The claim also described a floor tilted downward, as well as hairline wall and ceiling cracks throughout the house.

In December 2011, while the arbitration was pending, NMH sued Camarillo and two other defendants for contractual and equitable indemnity, contribution and related causes of action.[3] Paragraph 8 of the NMH complaint incorporated by reference, and attached as exhibit A, the Moghadams' arbitration claim that alleged the Moghadams' current damages were "at least $2,347,592." The NMH complaint further alleged (par. 19) "that Defendants, and each of them, had and have a duty to defend, indemnify, and hold harmless [NMH] for the claims made in the Moghadam Claimants' Arbitration Complaint, including attorneys' fees and costs." NMH's complaint did not otherwise specify the amount of damages sought, alleging damages "in an amount to be established at the time of trial."

---

[3] Another of the defendants, Neblett & Associates, Inc. prepared grading and geotechnical recommendations for site development and foundations, and performed grading observations and testing during development.

Camarillo did not answer NMH's complaint or otherwise appear in the NMH lawsuit, and its default was entered in March 2012.[4]

In October 2012, after hearings in June and July, the arbitrator in the Moghadam arbitration entered an award against NMH. The arbitrator stated that, "[g]iven the various testing that was conducted, it is undisputed that the house is damaged due to differential settling resulting from improper soil compaction."[5] The arbitrator also found "the soil is still settling and there is a potential for significant settlement over many years."

The final binding award gave the Moghadams "damages for diminution in value in the amount of $1,026,750, with interest at the legal rate accruing as of the date of the Interim Award dated August 13, 2012." As the prevailing party under the purchase agreement and joint escrow instructions, the Moghadams were awarded attorney fees of $105,000 and costs of $8,840.38, with interest at the legal rate accruing as of the date of the final award (October 9, 2012).

The award was confirmed in December 2012, in the principal sum of $1,140,590.38, plus prejudgment interest of

---

[4] In June 2012, after several tender letters from NMH to defendant, defendant advised NMH there was no "additional insured" coverage for NMH under the policies defendant issued to Camarillo.

[5] The arbitrator described the parties' disputes as "whether the settling will continue and to what degree"; "what repairs are necessary"; and whether "overwatering" and alteration of the landscape and drainage by the Moghadams were factors contributing to the damage.

$28,417.84, for a total award of $1,169,008.22.  The Moghadams recovered an additional $7,625 for attorney fees and costs incurred in preparation and filing of the petition to confirm the award, bringing their total recovery to $1,176,633.22.

Plaintiff fully indemnified NMH for the arbitration award to the Moghadams.

On August 7, 2013, NMH obtained a final default judgment against Camarillo in the amount of $1,532,973.87, consisting of damages of $1,176,633.22 and attorney fees of $356,340.65.[6]  (The request for default judgment was supported by declarations and documents including the subcontract, evidence from the Moghadam arbitration, and the arbitration award.)

## 2. The Complaint

In July 2015, plaintiff brought this lawsuit against defendant.  Plaintiff alleged causes of action for declaratory relief, subrogation, recovery of the judgment under section 11580, and breach of contract.  The complaint alleged defendant's policies provided coverage for the entire amount of the default judgment; defendant had a duty under those policies to indemnify Camarillo for the amount of the default judgment; and plaintiff was subrogated to NMH's rights to recover the amount of the default judgment, from Camarillo and defendant, by virtue of having indemnified NMH for the arbitration award.

## 3. The Motions for Summary Judgment

Both parties moved for summary judgment.

---

[6]     NMH also obtained a default judgment in the same amount against Neblett & Associates (see fn. 3, *ante*).  Both default judgments stated:  "joint and severally liable."

7

Defendant contended, in opposition to plaintiff's motion, that plaintiff could not prove all the elements of any cause of action against defendants. First, defendant asserted the default judgment was void as a matter of law under Code of Civil Procedure section 580, because NMH's complaint against Camarillo did not specify the amount of damages sought. Second, defendant asserted the arbitration award on which the default judgment was based was for economic loss, not property damage, and section 11580 permits an action against the insurer only when the judgment against the insured is "in an action based upon bodily injury, death, or property damage." (§ 11580, subd. (b)(2).) Third, defendant contended plaintiff did not satisfy its burden to prove the default judgment was covered under any of defendant's policies. This was because (a) plaintiff did not prove "when property damage first occurred" at the Moghadam property, and (b) plaintiff did not prove that Camarillo satisfied the applicable self-insured retention (SIR) or deductible under any of the policies. (We will describe and discuss these and other policy provisions to the extent necessary in connection with our legal discussion, *post*.)

Defendant's own summary judgment motion was based on the first two of defendant's three contentions.

Plaintiff argued that the default judgment was not void because the NMH complaint attached and incorporated by reference the Moghadam arbitration claim, specifying the damages sought from NMH for which NMH sought indemnity from Camarillo. Further, the arbitration award based on diminution in value was not an award for economic loss, because diminution in value was merely the measure of damages, and did not change the fact that the damages awarded arose from claims

8

the home suffered property damage as defined in defendant's policies. As for the coverage issues, defendant pointed out property damage was observed in May 2009, and argued expert testimony "indicated damages in other areas of the residence were likely occurring prior to that time, all of which was within the effective dates of [defendant's] polices, and at the very least, during the effective dates of [the policy], effective August 1, 2008 to August 1, 2009." Plaintiff argued the SIR and deductible provisions required defendant to request payment from its insured and there was no evidence defendant did so. Further, the 2008-2009 policy contained a deductible, not an SIR, and, plaintiff argued, under California law a deductible does not require payment "prior to an insurer providing coverage."

On November 22, 2016, the trial court entered an order denying defendant's motion and granting plaintiff's motion.

## 4. Proceedings After the Summary Judgment Ruling

Plaintiff served defendant with a proposed judgment that awarded plaintiff damages of $1,532,973.87 (the amount of the default judgment). Defendant filed objections to the proposed judgment. In substance, defendant reiterated the arguments it made in its summary judgment papers, and added a few new ones, including a claim that the judgment exceeded the per occurrence limits of defendant's insurance policies, and that plaintiff could not recover NMH's attorney fees and costs awarded in the default judgment, or any interest on the judgment, on the theory that those were costs, not damages, and thus fell under the "supplementary payments" provision of defendant's policies, which plaintiff could not enforce under section 11580. Plaintiff responded by asserting that no California authority permits a party to use objections to a proposed

9

judgment as a mechanism for reasserting arguments already raised or asserting new arguments after the court has issued a dispositive order.

On May 8, 2017, the court entered judgment "in favor of Plaintiff and against Defendant in the amount of $1,532,973.87 plus prejudgment interest at a rate of 10% per annum calculated from August 7, 2013."

On May 23, 2017, defendant filed a motion for a new trial, or alternatively to vacate the ruling and judgment. Defendant asserted irregularities and abuse of discretion preventing defendant from having a fair trial; excessive damages; insufficient evidence; and error in law. Defendant complained the court's ruling failed to address or make any findings on the property damage and coverage issues defendant raised, failed to specify the reasons for granting summary judgment or specifically refer to any evidence supporting that determination, and failed to rule on material evidentiary objections. Defendant's motion repeated all the arguments previously made (both before and after the summary judgment ruling), and added an argument that a "wrap-up" exclusion in its policies excluded coverage.

Plaintiff's response addressed defendant's substantive claims, and also contended that defendant's arguments had already been adjudicated or were waived by the failure to raise them during the extensive briefing and oral argument on the summary judgment motions.

The trial court denied defendant's motion, concluding "there was no error of fact or law, and no incorrect or erroneous legal basis for the decision, either as a matter of dispositive procedure, or of substantive law." The court observed that it "general[ly] concurs with the opposing memorandum on the

10

various substantive issues raised, and an exhaustive addressing of the issues in a ruling[] is not required."

Defendant filed a timely appeal from the judgment.

## DISCUSSION

### 1. The Standard of Review

A plaintiff moving for summary judgment "has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling the party to judgment on the cause of action. Once the plaintiff . . . has met that burden, the burden shifts to the defendant . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(1).) Summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Id.,* subd. (c).)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was " 'to liberalize the granting of [summary judgment] motions.' " (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854.) It is no longer called a "disfavored" remedy. (*Perry,* at p. 542.) "Summary judgment is now seen as a 'particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case." (*Ibid*.) On appeal, "we take the facts from the record that was before the trial court . . . . ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' " (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037, citation omitted.)

11

## 2. Contentions and Conclusions

Section 11580 requires policies insuring against loss or damage resulting from liability for injury suffered by another person to contain certain provisions. (*Id.,* subd. (a)(1).) One of these is a provision "that whenever judgment is secured against the insured . . . in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment." (*Id.,* subd. (b)(2).)

Defendant contends plaintiff did not establish any of the elements required by section 11580, because the default judgment NMH obtained was void; the underlying action was not based on property damage; and defendant's policies did not provide coverage of the underlying claims. We disagree.

### a. The default judgment was not void

Under Code of Civil Procedure section 580 (section 580), the relief granted to a plaintiff in a default judgment "cannot exceed that demanded in the complaint . . . ." (*Id.,* subd. (a).) The Supreme Court tells us that "section 580 is to be interpreted, in accordance with its plain language, to deprive a trial court of jurisdiction to enter a judgment against a defaulting defendant which awards greater relief than that sought in the plaintiff's complaint." (*In re Marriage of Lippel* (1990) 51 Cal.3d 1160, 1167; *id.* at p. 1166 ["California satisfies . . . due process requirements in default cases through section 580."]; *Becker v. S.P.V. Construction Co.* (1980) 27 Cal.3d 489, 493 (*Becker*) [permitting a collateral attack on a default judgment based on section 580 where the motion to vacate the judgment was not timely; " '[c]ollateral attack is proper to contest [a judgment void

12

on its face for] lack of personal or subject matter jurisdiction or the granting of relief which the court has *no power* to grant' "]; see, e.g., *Dhawan v. Biring* (2015) 241 Cal.App.4th 963, 975 [courts considering default judgments awarding damages in violation of section 580 "have consistently viewed the judgments as void, not voidable, and subject to collateral attack at any time"].)[7]

*Becker* further tells us that "a prayer for damages according to proof passes muster under section 580 *only* if a specific amount of damages is alleged *in the body of the complaint*." (*Becker, supra,* 27 Cal.3d at p. 494, italics added; see also *Greenup v. Rodman* (1986) 42 Cal.3d 822, 829 ["the allegations of a complaint may cure a defective prayer for damages"].)

In this case, the prayer for judgment in the NMH complaint does not state a specific amount of damages. (The prayer for judgment does not specify damages "according to proof," either.) And, as defendant points out, in the body of the complaint, NMH refers several times to damage in an amount "according to proof"or the like. The complaint states, for example, that because

---

[7]     Plaintiff tells us that because defendant chose not to defend Camarillo in the underlying action, and did not seek to vacate the default judgment NMH obtained, defendant cannot relitigate Camarillo's liability in this section 11580 action, citing *Clemmer v. Hartford Ins. Co.* (1978) 22 Cal.3d 865, overruled on another point in *Ryan v. Rosenfeld* (2017) 3 Cal.5th 124, 134-135. In *Clemmer,* the court held that an insurer who rested on its claim of noncoverage instead of moving to set aside a default judgment against its insured was bound by the amount of the judgment against its insured. (*Clemmer*, at p. 884.) *Clemmer* did not involve section 580 and has no application here.

of the defects and damages at the Moghadam property caused by defendants, NMH "[has] incurred and continue[s] to incur costs, the sum of which [is] not currently known"; that as a direct result of the defendants' failure to defend, indemnify and hold NMH harmless "for any claims or sums paid to the Moghadam Claimants," NMH "[has] been damaged in an amount to be established at the time of trial, which is no less than the jurisdictional limits of this court"; and that NMH was damaged by defendants' breaches of contract "in an amount according to proof at trial."

But in addition, as noted at the outset, NMH alleged in the body of the complaint that the Moghadams "served a Claim in Arbitration for Defective Construction . . . , attached hereto as Exhibit 'A' and incorporated herein by this reference, against [NMH] regarding alleged defects and/or deficiencies and related damages as to the Moghadam Property." The Moghadam claim that was attached and incorporated by reference alleged the Moghadams' "total current damages are at least $2,347,592."[8] The NMH complaint further alleged "that Defendants, and each of them, had and have a duty to defend, indemnify, and hold harmless [NMH] for the claims made in the Moghadam Claimants' Arbitration Complaint, including attorneys' fees and costs." The complaint alleged that "the damages claimed by the Moghadam Claimants" involve damages to the Moghadam

---

[8]     The Moghadam claim described the categories of damages it sought. These were all demolition and repair costs, relocation and storage expenses, lost home-business income, investigative costs, and other costs or fees, loss-of-use damages of at least $382,429, and at least $44,665 for expert fees in investigating and repairing the property.

14

property caused by the defendants.  The NMH complaint alleges NMH is "entitled to recover the funds they have expended and the costs they have incurred to date in addressing the claims of the Moghadam Claimants."

Despite all these factual allegations, defendant asks us to conclude the NMH default judgment was void for failure to allege "a specific amount of damages . . . in the body of the complaint" (*Becker, supra,* 27 Cal.3d at p. 494), thus violating the section 580 requirement that the relief granted in a default judgment "cannot exceed that demanded in the complaint" (§ 580, subd. (a)).  We cannot do so, because the NMH complaint was quite plain that NMH sought indemnity "for the claims made in the Moghadam Claimants' Arbitration Complaint," and NMH properly incorporated by reference into the body of the complaint the Moghadam claim for damages of "at least $2,347,592."  The default judgment of $1,532,973.87 was significantly less than the amount demanded in the complaint.

Defendant does not dispute that "a copy of the *Moghadam* Claim was attached to NMH's Complaint and incorporated therein by reference."  Instead, defendant contends that, as a matter of law, "incorporation by reference is inadequate to satisfy the strict and clearly worded statutory framework" of section 580 and related statutes.  Defendant's briefs cite no pertinent authority supporting this contention.[9]  While its argument on

---

[9]     Defendant relies on *Schwab v. Southern California Gas Co.* (2004) 114 Cal.App.4th 1308, which does not involve incorporation by reference.  *Schwab* involved whether plaintiff timely served statements of damages as required in personal injury cases.  Defendant cites *Schwab*'s statement that the statutes requiring a complaint to state the amount of damages

15

this point is opaque throughout, defendant concludes that "it would be contrary to the basic notions of due process and fairness to find that Camarillo was put on notice of damages sought against it based upon an arbitration claim not filed against Camarillo," and "[t]herefore" the default judgment is void.[10]  All we can say is that defendant's assertion has no support in law and is counter to the clear allegations of the NMH complaint.

After the briefs in this case were filed, the Fourth Appellate District decided the only case of which we are aware that concerns the principles of incorporation by reference in the context of section 580, *Yu v. Liberty Surplus Ins. Corp.* (2018) 30 Cal.App.5th 1024 (*Yu*).[11]  *Yu* rejected a claim of incorporation

---

"require formal notice of the amount of money damages or other relief sought *by the party seeking relief.*"  (*Id.* at p. 1325.)  Of course that is so, but NMH gave that notice to Camarillo here by incorporating the Moghadam claim by reference into the body of the complaint and expressly seeking indemnity for those very claims.  We do not see anything in *Schwab* pertinent to or inconsistent with our resolution of this case.

[10]     Defendant states the Moghadam arbitration claim "also contained an allegation of 'inadequate design and construction of the post tension slab foundation system,' for which Camarillo could not be responsible because that claim does not fall within Camarillo's scope of work."  That is correct, but defendant does not tell us why that is relevant to the notice issue.  (The arbitrator ultimately rejected the Moghadams' claims that the posttension slab was not properly constructed.)

[11]     Defendant filed a letter informing the court of the *Yu* case under California Rules of Court, rule 8.254(a), permitting a party to inform the court of "significant new authority" not available before the party's last brief was filed.

16

by reference, but did so under circumstances quite different from those in this case. *Yu* nowhere suggests that incorporation by reference of damage amounts is inadequate to satisfy section 580 as a matter of law. *Yu* merely held that the alleged incorporation by reference of the monetary demand in *Yu* was not " 'clear and unequivocal,' " as is required for incorporation by reference in other legal contexts. (*Yu,* at pp. 1032-1033.) That is not the case here.

As in this case, *Yu* involved a judgment creditor's action under section 11580 to collect a default judgment against certain subcontractors (the Fitch entities) from their insurers. The question was whether a cross-complaint on which the Fitch entities defaulted incorporated by reference the amount of damages claimed in the initial complaint. The facts, briefly, were these.

The plaintiff sued the general contractor for construction defects, and asserted damages of not less than $10 million. The general contractor filed a cross-complaint against the plaintiff and 20 subcontractors, including two known as the Fitch entities, that prayed for damages according to proof, and did not set out a monetary amount sought. The general contractor eventually settled with the plaintiff and assigned its cross-complaint rights to the plaintiff, who obtained a default judgment against the Fitch entities. (*Yu, supra,* 30 Cal.App.5th at pp. 1027-1030.)

When the plaintiff in *Yu* sued the insurers to collect on her default judgment, the trial court voided the judgment, because the cross-complaint did not state an amount of damages. (*Yu, supra,* 30 Cal.App.5th at p. 1030.) On appeal, the plaintiff argued that the cross-complaint "incorporated by reference the damage amount she had asserted in her initial complaint

17

against" the general contractor.  (*Id.* at p. 1032.)  *Yu* describes the cross-complaint as stating that the operative complaint " 'and any future amended complaints filed in this action and any cross-complaints filed in this action are incorporated herein by reference as though fully set forth herein, *for identification and informational purposes only . . . .' "  (*Ibid.*, italics added in *Yu*.)  *Yu* found this alleged incorporation of the monetary demand from the plaintiff's fourth amended complaint "was not 'clear and unequivocal.' "  (*Ibid.*)

The *Yu* court explained that "[a]lthough widely accepted," there were no "formal requirements" for " ' "*permissible incorporation by reference*" ' " in a cross-complaint of the pleadings in the original action.  (*Yu, supra,* 30 Cal.App.5th at p. 1032.)  But "in other legal contexts the doctrine of incorporation by reference generally 'requires that (1) the reference to another document was clear and unequivocal; (2) the reference was called to the attention of the other party, who consented to that term; and (3) the terms of the incorporated documents were known or easily available to the contracting parties.' "  (*Ibid.*)

The *Yu* court pointed out the cross-complaint repeatedly stated that its damage demand was "according to proof" or " 'in an amount precisely unknown,' " and that was at odds with "the purported demand in [the plaintiff's] complaint" asking for not less than $10 million in damages.  (*Yu, supra,* 30 Cal.App.5th at p. 1033.)  "Further, the cross-complaint stated that [the plaintiff's] complaint was being referred to 'for identification and informational purposes only.'  As a result, it is unreasonable to conclude that the damage demand was effectively called to the Fitch Entities' attention, or that they ever consented to it, or that

18

it was 'readily accessible' to them." (*Ibid.*) *Yu* then agreed with the trial court that because the cross-complaint " 'specifically declined' " to state the amount of damages sought, it was " 'contradictory to basic notions of due process and fairness to find' " that the Fitch entities " 'have been put on notice of their potential damages by virtue of an allegation in a complaint filed not against them, but against [the general contractor].' " (*Ibid.*)

We do not see any facts in *Yu* that would cause us to conclude that the NMH complaint did not properly incorporate by reference the Moghadam arbitration claim. Unlike *Yu*, the arbitration claim was not " 'incorporated . . . for identification and informational purposes only' "; the arbitration claim and the Moghadam claimants were repeatedly referred to in the NMH complaint. Unlike *Yu*, the arbitration claim was attached as exhibit A to the complaint, describing in detail the property damage and related claims of loss, and stating the Moghadams sought to recover "at least $2,347,592." And unlike *Yu*, the complaint expressly alleged that "the damages claimed by the Moghadam Claimants" involved damages to the Moghadam property caused by the defendants and for which they had a duty to indemnify NMH. These allegations were "clear and unequivocal" in calling to Camarillo's attention that NMH was seeking indemnification in the amounts alleged in the Moghadams' arbitration claim, which was "readily accessible" because it was attached as exhibit A to the complaint. Those allegations were more than adequate to put Camarillo on "formal notice" of the "maximum judgment that may be assessed against [it]," as required by due process. (*Greenup v. Rodman, supra,* 42 Cal.3d at p. 826.)

19

Finally, in a two-paragraph argument, defendant asserts that the Moghadam arbitration claim "only sought unspecified attorneys' fees, costs and interest"; the default judgment against Camarillo "included an award for these items"; and "[c]onsequently" the default judgment is void for violating section 580's notice requirements. Again, there is no authority for defendant's assertion. The default judgment entered against Camarillo was far less than the amount of damages identified in the arbitration claim, so there can be no legitimate claim of inadequate notice of Camarillo's maximum liability.

b.     **The property damage issue**

Defendant contends the judgment against Camarillo is not recoverable under section 11580 because it was not a judgment "based upon . . . property damage" within the meaning of section 11580. We disagree. To reach that conclusion would require us to ignore the facts and interpret the law in an irrational fashion.

In the arbitration, it was "undisputed that the house is damaged due to differential settling resulting from improper soil compaction." The arbitrator explained: "The Property is settling toward the area where soil compaction depth was near 50 [feet]. The post-tension slab is cracked entirely through near the mid section of the home at the approximate point of the fill transition. Floor level surveys demonstrated a differential from high to low of 1.8 [inches] in 2009, 2.4 [inches] in 2010 and 3.3 [inches] in 2012, contrasted to a normal of 3/4 [inch]. The parties also acknowledge that the residence walls contain numerous cracks on the interior and exterior and that posts and other structures are pulling away at points." That is property damage.

20

That is why the Moghadams sought arbitration, and it is why they obtained an award.

The law is equally clear. Under section 11580, when a judgment is secured against the insured (here, Camarillo) "in an action based upon . . . property damage," the judgment creditor (here, plaintiff as NMH's subrogee) may bring an action on the policy "to recover on the judgment." (*Id.,* subd. (b)(2).)

Defendant contends the judgment here was not for property damage, but rather was for indemnity of an arbitration award that awarded "economic loss for diminution in property value," and that, "[a]s a matter of law, diminution in value is economic loss, not property damage." We decline to adopt this constricted view of section 11580.

First, NMH's action against Camarillo for indemnity was plainly "based upon . . . property damage" (§ 11580, subd. (b)(2)), because NMH sought indemnity "for the claims made in the Moghadam Claimants' Arbitration Complaint," and those were claims for property damage, as we have just described above. (Defendant's policies define property damage as: "Physical injury to tangible property, including all resulting loss of use of that property.")

Second, the fact that the arbitrator measured the damages by diminution in value, rather than by the cost of repair, changes nothing. In statutory actions for construction defects (Civ. Code, § 895 et seq.), the homeowner's "right to the reasonable value of repairing any nonconformity is limited to the repair costs, or the diminution in current value of the home caused by the nonconformity, whichever is less . . . ." (§ 943, subd. (b)). The arbitrator awarded the diminution in value because NMH's proposed repair plans did not reflect the true value of the

21

necessary repairs, and the claimants' proposed repair costs *exceeded* the diminution in value – so the Moghadams' damages were necessarily "limited to $1,026,750, the diminution in value." To say the award was therefore not "based upon . . . property damage" is simply untenable.

Defendant's insistence to the contrary is based on cases stating that diminution in value is not property damage. (E.g., *New Hampshire Ins. Co. v. Vieira* (9th Cir. 1991) 930 F.2d 696, 701 (*Vieira)* ["diminution in value is not 'physical damage' to 'tangible property' " and so was not covered by the insurer's policy].) But that is not the issue here, where there *was* physical damage to the property, and diminution in value was necessarily used as the measure of damages. (See *Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500, 510, fn. 6 (*Pruyn*) ["In the liability policy context, diminution in market value is accepted as a proper *method of measurement* of any property damages which may have been sustained."].)[12]

---

[12] Defendant also cites cases  stating that property damage is not established "by the mere failure of a defective product to perform as intended," nor by "economic losses such as the diminution in value of the structure [citations] or the cost to repair a defective product or structure." (*F & H Construction v. ITT Hartford Ins. Co.* (2004) 118 Cal.App.4th 364, 372.)  These cases, like *Vieira,* are inapt.  *F & H Construction* discusses the principle that "the incorporation of a defective component or product into a larger structure does not constitute property damage unless and until the defective component causes physical injury to tangible property in at least some other part of the system." (*F & H Construction,* at p. 372.)  This case does not involve a defective "product," and in any event Camarillo's improper grading work *did* cause physical injury to the Moghadam home.

Third, defendant points out that the default judgment includes attorney fees and costs awarded to the Moghadams, and "these components of the default judgment also cannot satisfy the 'property damage' requirement of section 11580 (b)(2)." Defendant misreads section 11580, which allows a judgment creditor to recover on the judgment when the judgment was secured "in an action based upon . . . property damage." The statute on its face does not require every element of the damages in that judgment to *be* property damage; it requires the judgment to be "in an action based upon . . . property damage." Here, all the components of the Moghadam arbitration award – the "diminution in value," the attorney fees, the costs, the interest – were the result of property damage that was "due to differential settling resulting from improper soil compaction."

In short, we are in no doubt that the NMH default judgment was secured "in an action based upon . . . property damage," and none of the authorities defendant cites requires a contrary conclusion.

### c.     The coverage issues

A judgment creditor's direct action against the insurer under section 11580 is "on the policy and subject to its terms and limitations." (*Id.,* subd. (b)(2).) Defendant contends plaintiff did not prove the default judgment was covered under any of defendant's policies. In the trial court, defendant asserted two bases for the claimed lack of coverage. We conclude defendant is mistaken on both points.

### i.     When the damage "first occurred"

Defendant first contends plaintiff did not prove when property damage first occurred at the Moghadam property, and therefore the damage is not covered by any of the policies. We

23

disagree with defendant's construction of the policy. It is clear there is coverage under at least one of the policies: the sixth policy in effect from August 1, 2008, to August 1, 2009.

### (1) The policy language

Defendant issued six successive policies to Camarillo.[13] The policies define property damage as "[p]hysical injury to tangible property." Each policy applies to property damage only if "(1) [t]he . . . 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and [¶] (2) [t]he . . . 'property damage' occurs during the policy period."

There is very little substantive difference in the six policies, but the sixth is slightly different from the others in the placement of some provisions. Where provisions differ, we use those in the sixth policy, since that is the one that definitively covers the property damage suffered by the Moghadams.

The sixth policy defines "occurrence" to mean:

> "an accident, including continuous or repeated exposure to substantially the same general harmful conditions that happens during the term of this insurance."

For sake of clarity, we note at the outset that there is no dispute that the property damage was "caused by an 'occurrence' that takes place in the 'coverage territory' " (the United States) and that the causal act (Camarillo's improper grading) need not have taken place during the term of the insurance policy that covers the damage. "Occurrence" in this context is construed to mean

---

[13] The policies covered December 1, 2003 to December 1, 2004; December 1, 2004 to December 1, 2005; December 1, 2005 to December 1, 2006; August 1, 2006 to August 1, 2007; August 1, 2007 to August 1, 2008; and August 1, 2008 to August 1, 2009.

24

that what must happen "during the policy year to trigger coverage" is "damage to property, not the causal conduct." (*Pennsylvania General Ins. Co. v. American Safety Indemnity Co.* (2010) 185 Cal.App.4th 1515, 1534 (*Pennsylvania General*).) Defendant does not contend otherwise.

The endorsement in the sixth policy (amending the definition of "occurrence" to read as just quoted) also added the following language to the coverage section of the policy (the language was previously a part of the definition of "occurrence"):

> " 'Property damage' . . . which commenced prior to the effective date of this insurance will be deemed to have happened in its entirety prior to, and not during, the term of this insurance."

The endorsement further states:

> "We will have no duty to defend or indemnify the insured against any 'suit' against an insured or any additional insured if such 'suit' does not allege an 'occurrence' as defined and meet the timing conditions as to both 'occurrence' and 'property damage' . . . of this policy."[14]

### (2) Defendant's argument

Defendant tells us that, because none of the policies provides coverage "for property damage which commenced prior to the policy period," and plaintiff did not offer evidence to establish when property damage first occurred, there is no coverage under any of the policies. We disagree.

---

[14] All the policies also have a damage exclusion endorsement stating the insurance does not apply to any occurrence "which first occurred prior to the inception date of this policy."

No "[p]hysical injury" to the Moghadams' residence occurred until May 2009, and they advised NMH at that time, during the term of the sixth policy. Defendant's contention is based, in effect, on plaintiff's argument that *all* the policies cover the property damage (a point we need not decide), and on defendant's own mistaken view that, even if property damage first "manifested" during the policy period, the insured must *also* prove that the damage did *not* "first commence" at some earlier time. Defendant's contention is contrary to the policy's definition of property damage, without support in legal authority, and an unreasonable construction of the insured's burden of proof.

We agree, of course, that "[t]he burden is on an insured to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage." (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1188.) But, "once an insured has made this showing, the burden is on the insurer to prove the claim is specifically excluded." (*Ibid.*)

Plaintiff made its required showing. The "basic scope of insurance coverage" in this case is as we have just described: the policy applies to "property damage" – "[p]hysical injury to tangible property" – that "occurs during the policy period." Plaintiff submitted the arbitration award as evidence. That award established that in 2009, the Moghadams noticed "drywall and stucco cracks, separation and cracking along the mortar joint of interior tiles . . . and lifting of exterior flagstone work," and complained to NMH in May 2009. This is plainly evidence of property damage – "[p]hysical injury to tangible property" – that first appeared during the term of defendant's sixth policy. We do not see how any other conclusion is possible. Defendant's constant refrain that plaintiff "did not offer any evidence to

26

establish when property damage first occurred at the Property" is simply wrong.

Defendant's challenge to this straightforward analysis draws upon plaintiff's argument that *all* the policies in effect "from the time Camarillo completed its work at the Moghadams' residence forward provide coverage for the damages in question." Defendant may well be correct when it contends this is not so.[15]

---

[15] Plaintiff's contention that all the policies provide coverage relies on the "continuous injury trigger of coverage" the Supreme Court adopted in *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 685 (*Montrose*). *Montrose* held that "[i]n the case of successive policies, . . . property damage that is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods," so that the insurer's duty to defend arose under those policies. (*Id.* at p. 655.) The "continuing injury trigger of coverage" may well be inapt here, because it depends on the language of the policy, as *Montrose* itself tells us. (*Id.* at p. 677 ["The precise question, of course, is what result follows *under the language of the policies of insurance to which the parties agreed . . . .*"]; cf. Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2018) ¶ 7:176, p. 7A-93 ["[t]he 'continuous injury' trigger has been applied mostly in cases involving gradual release of pollutants and other environmental harms"].) After *Montrose*, defendant revised its policies to use the language that is in the policies issued to Camarillo, for the very purpose of "obviat[ing] the application of the 'progressive damage-continuous trigger' articulated in *Montrose*." (*Pennsylvania General, supra,* 185 Cal.App.4th at p. 1534.) Thus, defendant's policies state, as described *ante*, that property damage "which commenced prior to the effective date of this insurance will be deemed to have happened in its entirety prior to, and not during, the term of this insurance."

But we need not decide that point, because coverage *is* established under the sixth policy.

Despite the evidence that physical injury to the Moghadam residence occurred in 2009 (and the lack of any evidence that there was earlier physical injury to the home), defendant, relying on *Pennsylvania General,* asks us to conclude plaintiff did not present evidence "of when property damage first occurred at the Property." As just demonstrated, we cannot so conclude, and *Pennsylvania General* does not suggest otherwise.

*Pennsylvania General* involved defendant's policies, containing language identical to the policies defendant issued to Camarillo. But the issue in *Pennsylvania General* was different. There, defendant contended the language in its policies defining "occurrence" – requiring the occurrence to "happen[] during the term of this insurance" (see *ante,* at p. 24) – "excludes coverage where the causal conduct takes place before the inception of the policy regardless of when the resulting damage first occurs." (*Pennsylvania General, supra,* 185 Cal.App.4th at p. 1528.) The court rejected that contention (*ibid.*), concluding "the trigger of coverage was not when the insured completed its work, but was instead based on when the damages caused by the negligent causal acts of the insured first commenced." (*Id.* at p. 1532.)

We have no disagreement with *Pennsylvania General*'s conclusion, but it does not relieve defendant of liability on the sixth policy. The evidence showed physical injury to the property in 2009 (and not before). In its reply brief, defendant tells us, in effect, that it does not matter that the property damage "manifested" in 2009, because "it is the 'occurrence' of property damage during the policy period that triggers liability coverage under the policy," not the "manifestation of loss." That is simply

28

a circular repetition of the same flawed argument, based on inapt authority.[16]

In *Pennsylvania General*, the court described the issue as "whether the 'occurrence,' which must happen during the policy year to trigger coverage under [defendant's] policy, is *the first manifestation of damage* rather than [the insured's] causal conduct." (*Pennsylvania General, supra,* 185 Cal.App.4th at p. 1530, italics added.) As discussed above, the court held a reasonable interpretation of defendant's policy was that the trigger of coverage was damage to property, not the causal conduct. (*Id.* at p. 1534.) The court further noted the facts were disputed "on when the damages sought in the construction defect

---

[16]    Defendant cites *Pepperell v. Scottsdale Ins. Co.* (1998) 62 Cal.App.4th 1045, 1050-1053 for the proposition that (according to defendant and without further analysis), "under California law, manifestation of loss is not the applicable trigger of coverage for construction defect claims." *Pepperell* does not state that proposition. In *Pepperell*, the complaint alleged that "latent and hidden" construction defects were not discovered until they began to manifest themselves in 1991, and the insured's policy was in effect during construction of the home from 1988 to 1989. (*Id.* at p. 1048-1049.) The court held that, in light of the terms of the policy in that case, the allegations of the complaint regarding construction defects, and the continuing or progressive damages caused by those defects, "the 'continuous injury' trigger of coverage must be applied as a matter of law," rather than the " 'manifestation of loss' " trigger. (*Id.* at pp. 1050-1051.) Notably, the insurance policy in *Pepperell* was "*identical in every material respect to the policy*" in *Montrose* (*Pepperell*, at p. 1051) – which, as defendant has been at pains to tell us, is not the case with its policies, which were amended in order to circumvent the *Montrose* principle.

29

litigation first commenced" (*ibid.*), specifically, "over whether damages attributable to [the insured's] work *first manifested themselves* prior to the inception of [defendant's] policy." (*Id.* at p. 1519, fn. 2, italics added.)

Thus, *Pennsylvania General* itself puts the lie to defendant's assertion that, despite the first appearance of actual property damage in 2009, plaintiff must prove something more. There is no legal support for that proposition. Defendant's policy "deem[s]" property damage that commenced before the policy's effective date (August 1, 2008) to have happened in its entirety before that date. The only reasonable construction of this clause is that it applies to circumstances where damage actually appeared before the effective date of the policy, in which case the damage "is deemed to have happened in its entirety" before that date. But once plaintiff showed property damage that first appeared in 2009, it was up to defendant to prove that property damage actually occurred before that date, and of course defendant did not and could not do so.

And so we return to first principles. In sum:

The parties agree, both of them citing and quoting *Whittaker Corp. v. Allianz Underwriters, Inc.* (1992) 11 Cal.App.4th 1236, that "[f]or the purpose of determining whether there was *coverage within the policy period,* it is well established that the time of the relevant 'occurrence' or 'accident' is not when the wrongful act was committed but when the complaining party was actually damaged." (*Id.* at p. 1241.) The Moghadam property was "actually damaged" when there was "physical injury" to their home in 2009. And it is a "settled rule" that "an insurer on the risk when continuous or progressively deteriorating damage or injury first manifests itself remains

30

obligated to indemnify the insured for the entirety of the ensuing damage or injury." (*Montrose, supra,* 10 Cal.4th at p. 686; see Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:171, p. 7A-92 ["[i]f the . . . property damage was *not* known to the insured before the policy period, a [comprehensive general liability] policy covers any such . . . damage that occurs *during* the policy period, together with 'any continuation, change or resumption' of that damage after the end of the policy period"].)

Defendant's sixth policy by its terms covered the physical injury to the home in 2009, as well as any ensuing damage.

### ii. The self-insured retention (SIR) claim

Defendant's second basis for asserting no coverage under its policies is that plaintiff offered no evidence the applicable self-insured retention (SIR) or deductible was satisfied under any of the policies. (The SIR's ranged from $15,000 to $50,000 per occurrence for various coverages, and the deductible in the sixth policy was $10,000 per occurrence.) Defendant says that satisfaction of the SIR's (in the first five policies) and the deductible (in the sixth policy) was a condition precedent to its coverage obligation, and plaintiff offered no proof the applicable SIR or deductible was satisfied under any of the policies.

Notably, defendant refers us to the record containing its SIR and deductible endorsements, but does not quote the language of those provisions in its brief. The "condition precedent" language on which defendant relies is this:

> "As a condition precedent to our obligations to provide . . . indemnity, coverage or defense hereunder, the insured, upon receipt of notice of any 'suit', incident or 'occurrence' that may give rise to a 'suit', *and at our request*, shall pay over and deposit with us all or any part of the deductible

31

amount as specified in the policy, *requested by us*, to be applied by us as payment toward any damages or supplementary payments . . . incurred in the handling or settlement of any such incident, 'occurrence' or 'suit'." (Italics added and capitalization omitted.)

(The "condition precedent" language of the SIR's is substantively identical. We quote the deductible provision because it is the sixth policy that we have held otherwise provides coverage, as discussed in part 2.c.i., *ante*.)

We need not engage in a lengthy discussion of the law governing SIR's and deductibles. As defendant points out, the authorities tell us that a deductible "generally is 'a specific sum that the insured must pay before the insurer owes its duty to indemnify the insured for a covered loss.' " (*Forecast Homes, Inc. v. Steadfast Ins. Co.* (2010) 181 Cal.App.4th 1466, 1474 (*Forecast Homes)*; see also Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7:379, p. 7A-155.) The term SIR " 'refers to a specific sum or percentage of loss that is the insured's initial responsibility and must be satisfied *before* there is any coverage under the policy.' " (*Forecast Homes*, at p. 1474; see also Croskey et al., *supra*, ¶ 7:384, p. 7A-160.) "Unlike a deductible, which generally relates only to damages, an SIR also applies to defense costs and settlement of any claim." (*Forecast Homes,* at p. 1474.)

There is a rather important caveat, however. "[C]ourts interpreting SIR's are all careful to note an SIR, like any insurance provision, must be enforced according to its plain terms." (*Forecast Homes, supra,* 181 Cal.App.4th at p. 1475.) We have just quoted those terms, and they twice specify that payment of the deductible or the SIR is required "*at our request*" and the insured "shall pay over and deposit with us all or any

32

part of the deductible amount [or SIR amount] as specified in the policy, *requested by us*, to be applied by us as payment toward any damages . . . ."

In its summary judgment papers, defendant presented no evidence that it ever requested Camarillo to "pay over and deposit with us all or any part of the deductible." Under the plain terms of the endorsements, defendant's request for payment is a part of the "condition precedent" to its indemnity obligation. Because there is no evidence defendant made a request for payment of the deductible, there is necessarily no merit to defendant's claim it has no indemnity obligation. The same is true of the SIR's.

In its reply brief, defendant cites *Evanston Ins. Co. v. American Safety Indemnity Co.* (N.D.Cal. 2011) 768 F.Supp.2d 1004 (*Evanston*), telling us the *Evanston* court "analyz[ed] the same language in [defendant's] policies" and "rejected the argument that [defendant] must demand payment of the SIR to render the SIR endorsement enforceable." If the court had done so, we would disagree, but that is not what the *Evanston* court said or did.

In *Evanston*, the insured tendered its defense to defendant, and defendant *did* request payment of the SIR. (*Evanston, supra,* 768 F.Supp.2d at p. 1008.) The insured did not pay the SIR until about 15 months after its tender of defense, and the issue was when defendant's duty to defend attached – at the time of tender of defense or upon payment of the SIR. The court held the policy "clearly conditioned Defendant's defense duty on [the insured's] payment of the SIR," and "[n]o duty to defend attached until that payment was received." (*Id.* at p. 1013.)

33

In short, *Evanston* does not involve the insurer's failure to demand payment of the SIR; quite the opposite. Nothing in *Evanston* in any way contradicts our construction of defendant's deductible and SIR endorsements.

### iii.    The wrap-up exclusion claim

Defendant contends coverage is also excluded under a "wrap-up" exclusion in its policies, which states the insurance does not apply to "any work insured under a consolidated (Wrap Up) Insurance Program."[17] Defendant argues that plaintiff's excess policy follows form to the underlying policy Everest Indemnity issued to NMH (see fn. 1, *ante*), and the supplementary declarations in the Everest policy identifying "other named insureds" lists "[a]ll contractors and subcontractors enrolled in the Owner Controlled Insurance Program (OCIP)." From this, we are to conclude defendant's policies do not cover Camarillo's work.

We will not address this contention. It was not raised in defendant's opposition to plaintiff's summary judgment motion or in defendant's own summary judgment motion. It is a classic

---

[17] The wrap-up exclusion states: "This insurance does not apply to any work insured under a consolidated (Wrap Up) Insurance Program and this insurance shall have no obligation to defend or indemnify for any claim or any project where such wrap-up insurance exists or has ever existed. This exclusion applies whether or not a claim is covered under such wrap-up insurance, the limits of such wrap-up insurance are exhausted, the carrier is unable or unwilling to pay or for any other reason. A consolidated (Wrap Up) insurance program as referred to herein includes any owner controlled insurance policy (OCIP) or similar insurance policy or program which insures most or all contractors and subcontractors involved in a project."

example of a claim that was not "factually presented, fully developed and argued to the trial court," and that we will not consider for the first time on appeal. (*Peart v. Ferro* (2004) 119 Cal.App.4th 60, 70 [" 'unless they were factually presented, fully developed and argued to the trial court, potential theories which could theoretically create "triable issues of material fact" may not be raised or considered on appeal' "].)

Defendant protests that it briefed the issue in its motion for a new trial, and that in any event it is "strictly a question of law" that we may decide even if not raised in the trial court. First, defendant cites no authority for the claim that raising a new theory in a new trial motion preserves it for appeal. New theories that could have been raised, but were not, is not one of the causes that permits a new trial. (See Code Civ. Proc., § 657.) Second, while an appellate court may decide pure questions of law not raised below, defendant cites no authority requiring an appellate court to do so or explaining why we should depart from established appellate principles to do so here. And third, plaintiff suggests there are questions of fact relevant to defendant's new contention, from which we infer defendant has not presented a pure question of law. Accordingly, we find this a particularly appropriate case for declining to review defendant's new theory for excluding coverage under its policy.

### d.    The "per occurrence limits" claim

Next, defendant contends the award of $1,532,973.87 is excessive because "it exceeds the $1,000,000 per occurrence limits of each of [defendant's] Policies." (Under defendant's sixth policy, the limits of insurance include an "Each Occurrence Limit" of $1 million and a "Products-Completed Operations Aggregate

Limit" of $2 million.)[18]  Defendant says plaintiff offered no evidence or argument that the Moghadam claim involved more than one occurrence; the Moghadam claim "was a discrete, soil related construction defect claim involving one residence"; and so there is no basis to conclude the Moghadam claim involved multiple occurrences.

Defendant's opposition to plaintiff's summary judgment motion did not raise policy limits as a defense to plaintiff's claim for indemnification in the entire amount of the default judgment. Defendant did not raise its policy limits/single occurrence argument until after the trial court's dispositive ruling on the summary judgment motions.  There is some irony in defendant's complaint that, "[i]ndeed, the trial court's ruling does not make any finding with respect to the number of occurrence(s) in the Moghadam Claim."  The court did not do so, because no one raised the issue before the court ruled on the summary judgment motions.

Defendant again cites no authority for its assertion that raising a new theory in its objections to the proposed judgment, or in its new trial motion, preserves it for appeal.  In short, for the same reasons we have discussed in connection with defendant's wrap-up exclusion claim, we decline to review this new theory for reversal of the summary judgment.

### e.    NMH's attorney fees and costs

Defendant contends that plaintiff cannot recover the portion of the default judgment – $356,340.65 – that represents

---

[18]     The other policies also have limits of $1 million each occurrence.  The first four policies have a $1 million (and the fifth a $2 million) products-completed operations aggregate limit.

36

NMH's attorney fees and costs. Defendant offers two bases for this assertion.

Defendant first says that under its policies, attorney fees and costs are not "property damage," despite legal authority to the contrary. (*Golden Eagle Ins. Co. v. Insurance Co. of the West* (2002) 99 Cal.App.4th 837, 842 ["the indemnitee's defense costs are sums the insured is legally obligated to pay as *damages* because of property damage"].) Defendant makes an elaborate argument to the effect that its policy definition of "insured contract" is different from the standard definition in the policies in *Golden Eagle*, with the result (it claims) that NMH's defense fees in the Moghadam claim are not covered. Then, defendant says the $356,340.65 in attorney fees and costs – as well as "pre-judgment interest on the entirety of the default judgment" – cannot be recovered in a direct action under section 11580. This is because attorney fees and prejudgment interest are "costs" under the "supplementary payments" provision of defendant's policy, and, defendant claims, a judgment creditor's right to recover does not extend to amounts payable under a policy's supplementary payments provision.

Both of defendant's contentions suffer from the same defect as defendant's claims about the wrap-up exclusion and policy limits: They were not made during the summary judgment proceedings. Defendant raised these assertions only after the trial court's summary judgment ruling. Moreover, defendant's claim that prejudgment interest cannot be assessed on the amount of the default judgment misapprehends the law. NMH obtained the default judgment on August 7, 2013, and the judgment in this case assesses prejudgment interest calculated from August 7, 2013. Plaintiff is entitled to prejudgment interest

under Civil Code section 3287, not because of any provision in defendant's policy.

## DISPOSITION

The judgment is affirmed.  Plaintiff is to recover its costs on appeal.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

WILEY, J.