Filed 12/2/20  Kent v. Wu CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| JOSHUA KENT, | B297303 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No.  BC682905) |
| v. | |
| DAVID D. WU et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Christopher Lui, Judge.  Affirmed.

Ferguson Case Orr Paterson and John A. Hribar for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson; Carroll, Kelly, Trotter, Franzen & McBride, Michael J. Trotter and Jessica Muñoz for Defendants and Respondents.

Plaintiff Joshua Kent filed a civil action for medical malpractice against defendant David D. Wu. M.D.  Kent appeals the summary judgment entered in favor of Wu.  He also appeals the denial of his motion for a new trial.  He contends summary judgment was improper because 1) Wu failed to offer evidence that the epidural he performed on Kent was medically necessary; 2) Wu did not obtain informed consent for the epidural; 3) Wu offered only a conclusory expert declaration which was not sufficient to shift the burden to Kent to create a triable issue of fact; 4) the declaration of his expert was sufficient to create a triable issue of fact on causation.  He also contends the trial court erred in denying the new trial motion for the same reasons the court erred in granting Wu's summary judgment motion.  We affirm the judgment.

## BACKGROUND

On July 25, 2016, Kent was in a motor vehicle accident.  He was struck from behind and believes that, as a result, his right hand struck the steering wheel.  Kent was thrown forward by the impact.  On July 31, 2016, Kent visited a hospital emergency room and reported that since the accident he had been experiencing lower back and right wrist/thumb pain.

On September 1, 2016, Kent visited Dr. Wu, a pain management specialist.  Dr. Wu injected steroids into several locations in Kent's right thumb area.  On September 15, 2016, Kent returned to Dr. Wu who again injected steroids into several locations in Kent's right thumb area.  On September 24, 2106, Dr. Wu performed a cervical epidural procedure or injection on Kent.

Kent's symptoms did not improve, and on October 31, 2016, he visited Dr. Eleonora Spokoyny, a neurologist.  He complained

2

of ringing in his ears, constant headaches, dizziness, bilateral neck pain, mid back pain, lower back pain, right hand and wrist pain, and numbness in his right thumb. Dr. Spokoyny determined to a reasonable degree of medical probability that Kent's condition and symptoms were the direct result of his July 25, 2016 car accident.

Kent continued to visit doctors seeking relief for various symptoms he was suffering. In this course of this action, Kent has most frequently referred to his visits to Dr. Helm and Dr. Kluber, but in his interrogatory responses he also identified Dr. Omar Mora, Dr. Nick Halikis, Dr. Sang Le, Dr. Ali Elahi, Dr. Hannah Chung, and Dr. Moheimani.

Eventually, Kent filed this action against Wu, alleging Wu negligently performed the injections to Kent's right thumb area, resulting in "discoloration and injury" to the thumb. Kent also alleged the cervical epidural performed by Wu was not medically necessary. Kent did not allege any specific injury from the epidural, and did not allege that the epidural itself was the injury. Kent later stated that his neck pain increased after the epidural. Kent continued to visit doctors while this action was pending.

Wu moved for summary judgment on the ground that he did not cause Kent's injuries. After the trial court granted summary judgment in favor of Wu, Kent moved for a new trial on essentially the same grounds as he had opposed summary judgment. The motion was denied.

3

# DISCUSSION

We review an order granting or denying summary judgment or summary adjudication independently. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142; *Buss v. Superior Court* (1997) 16 Cal.4th 35, 60.) In making this review: " ' "First, we identify the issues raised by the pleadings, since it is these allegations to which the motion must respond; secondly, we determine whether the moving party's showing has established facts which negate the opponent's claims and justify a judgment in movant's favor; when a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." ' " (*Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 229 (*Claudio*).) " ' 'Declarations of the moving party are strictly construed, those of the opposing party are liberally construed, and doubts as to whether a summary judgment should be granted must be resolved in favor of the opposing party. The court focuses on issue finding; it does not resolve issues of fact.' " (*Assilzadeh v. California Federal Bank* (2000) 82 Cal.App.4th 399, 409 (*Assilzadeh*).)

" ' [D]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. In other words, review is limited to issues which have been adequately raised and briefed.' " *(Claudio, supra,* 134 Cal.App.4th at p. 230.)

In motions for summary judgment or adjudication, " '*all* material facts must be set forth in the separate statement. "This is the Golden Rule of Summary Adjudication: if it is not set forth in the separate statement, *it does not exist.*" ' " [Citation.] Thus, when the 'fact' is not mentioned in the separate statement, it is irrelevant that such fact might be buried in the mound of paperwork filed with the court, because the statutory purposes are not furthered by unhighlighted facts." (*North Coast Business Park v. Nielsen Construction Co* (1993) 17 Cal.App.4th 22, 30–31.) "The corollary for an opposing party, unless it wishes to advance additional disputed or undisputed material facts, is that it clearly indicate which of the facts contained in the moving party's separate statement it disputes. (§ 437c, subd. (b)(3).) Each party also must supply a 'reference to the supporting evidence' in its separate statement (§ 437c, subd. (b)(1), (3))." (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1214 (*Parkview Villas*).)

" 'If, in deciding this appeal, we find there is no issue of material fact, we affirm the summary judgment if it is correct on any legal theory applicable to this case, whether or not that theory was adopted by the trial court, and whether it was raised by the [defendant] in the trial court or first addressed on appeal.' " (*Assilzadeh*, *supra*, 82 Cal.App.4th at p. 409.)

There is no reporter's transcript for the hearing on the summary judgment motion. Kent contends none is needed and Wu does not disagree. The trial court provided a detailed statement of its ruling. We agree with the parties that the claims on appeal may be resolved by reference to the clerk's transcript alone.

I.      *In Opposing the Motion for Summary Judgment Kent Failed to Clearly Raise a Theory of Self-Evident Causation As to the Epidural and So That Theory Did Not Preclude Summary Judgment in Wu's Favor.*

Kent contends the cervical epidural was medically unnecessary and the trial court erred in granting summary judgment because causation is "self-evident" when a doctor performs a medically unnecessary procedure.  Causation may be self-evident from a medically unnecessary procedure, but a plaintiff's reliance on that theory is not self-evident.  Kent has elected to proceed without a reporter's transcript, so we cannot ascertain whether he raised this theory at the hearing on the motion for summary judgment.  The clerk's transcript, however, shows that Kent did not clearly raise or develop the claim that his injury from the epidural was based solely on the procedure being unnecessary.  Thus, this undeveloped theory may not be raised now to challenge the summary judgment.  (*Insurance Co. of State of Pennsylvania v. American Safety Indemnity Co.* (2019) 32 Cal.App.5th 898, 922.)

" 'The elements of a cause of action for professional negligence are failure to use the skill and care that a reasonably careful professional operating in the field would have used in similar circumstances, which failure proximately causes damage to plaintiff.' " (*Cyr v. McGovran* (2012) 206 Cal.App.4th 645, 651.)  With respect to the element of proximate cause, "[i]n a medical malpractice action, the evidence must be sufficient to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result." (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 216.)  Self-evident causation is

6

not in fact self-evident. It does not arise, as Kent seems to believe, out of thin air. It is "self evident that unnecessary surgery is injurious and causes harm to a patient. Even if a surgery is executed flawlessly, if the surgery were unnecessary, the surgery in and of itself constitutes harm." (*Tortorella v. Castro* (2006) 140 Cal.App.4th 1, 11.) If, in opposing summary judgement, the opposing papers raise a triable issue as to whether a physician deviated from the standard of care by unnecessarily performing surgery, that is sufficient also to raise triable issues with respect to the two remaining elements of a cause of action for medical malpractice, namely, " ' " 'proximate causal connection between the negligent conduct and the resulting injury; and . . . actual loss or damage resulting from the professional's negligence.' " ' " (*Id.* at p. 13; see *Jameson v. Desta* (2013) 215 Cal.App.4th 1144, 1166–1167.)

Kent did not offer any evidence that the epidural was medically unnecessary, which would clearly have raised a triable issue of material fact on causation. He now contends that because his complaint alleged the procedure was medically unnecessary, the burden was on Wu to offer evidence that it was medically appropriate. Absent evidence by Wu negating this allegation, Kent contends he had no burden to offer evidence.

Kent bases this argument on the general rule that a plaintiff "is allowed to rely upon the allegations of the complaint which were unchallenged in the motion itself, but only to demonstrate that [a defendant] has not met its initial burden of showing an entitlement to summary judgment. For example, if a plaintiff had alleged three distinct breaches of duty which caused him a single injury, and the defendant filed a motion for summary judgment with evidence contradicting only two of those

7

breaches, the plaintiff could rely upon the third, unchallenged, allegation of breach to demonstrate the motion was insufficient on its face to shift the burden." (*Tilley v. CZ Master Assn.* (2005) 131 Cal.App.4th 464, 478.)

Wu did offer evidence in the form of an expert declaration by Dr. Steven Richeimer, that the epidural did not cause Kent's injuries. The only question remaining, then, with respect to the epidural is whether Kent sufficiently alleged in his complaint that undergoing the unnecessary epidural itself was the injury of which he complained, that is, the self-evident injury.

In determining whether a particular theory is framed by the pleadings, " '[t]he test is whether such a particular theory or defense is one that the opposing party could have reasonably anticipated would be pursued.' " (*Jones v. Awad* (2019) 39 Cal.App.5th 1200, 1211.)

Here, Kent alleged Wu "negligently performed right thumb insertion and sheath injections to Plaintiff JOSHUA KENT on 9/1/16 and right median nerve/carpal tunnel injections to Plaintiff JOSHUA KENT on 9/15/16, that injured Plaintiff by causing discoloration and injury to his right thumb; and that Defendants, and each of them, negligently provided cervical epidural steroid injection treatment to Plaintiff JOSHUA KENT on 9/24/16, in that this cervical epidural steroid injection treatment was not medically necessary." While Kent did not allege any specific injury tied to the epidural, he also did not expressly allege that the unnecessary epidural was itself the injury.

Discovery often clarifies a plaintiff's theories of the case, but it did not do so here. In response to special interrogatories, Kent answered: "As to my cervical injury: the cervical epidural steroid injection treatment provided on 9/24/16 was not medically

8

necessary as there is no MRI finding showing any disc disease or neural element impingement, and there is no evidence of radicular symptoms.  Furthermore, Dr. Wu never recommended such treatment in his evaluation either.  Instead, he recommended bilateral C3-6 medial branch blocks, a completely different procedure."  This is not an allegation that undergoing the cervical epidural was the injury Kent suffered;  it is a claim that Kent did not receive the recommended appropriate treatment of a branch block that would have stopped his pain.

Thus, we question whether Wu could have reasonably anticipated from the complaint and discovery that Kent was pursuing a theory that undergoing the unnecessary epidural itself was the injury he suffered, as opposed to the theory that the injuries Kent continued to suffer were caused or exacerbated by Wu's negligent treatment, necessary or not.  When Wu moved for summary judgment, he did so on the ground that the epidural did not cause any injury to Kent.  In his separate statement of undisputed facts, Wu proposed as an undisputed fact that "[a]ny alleged negligent treatment did not cause plaintiff any injury."  He also proposed:  "To a reasonable degree of medical probability, no alleged violation of the standard of care by Dr. Wu caused or contributed to plaintiff's injuries.  Moreover, no alleged violation of the standard of care by defendants was a significant contributing factor in plaintiff's injuries."

If Kent had intended to pursue the "self-evident" injury theory, his opposition was the time to make this clear.  Kent could have opposed the motion by arguing that his complaint alleged the epidural was itself his injury because it was unnecessary.  He did not do so.  Kent's arguments in his memorandum in opposition to the motion talk around such an

9

argument, instead of making it. He argued that Wu basically negligently chose an incorrect and ineffective treatment for his medical symptoms. Kent stated that the cervical epidural injection was "inappropriate" and "Dr. Helm states that any cervical epidural injections provided were not reasonable and necessary to cure or relieve the injuries suffered" in the motor vehicle accident. Kent also stated: "Based on Dr. Helm's statements in the medical records there also exists a triable issue of fact to if the cervical injections were appropriate and if Dr. Wu's care in administering the cervical injections was negligent." Kent also contended "the cervical steroid injections was also [below] the standard of care and caused Plaintiff damages."[1] Kent, however, did not directly argue, factually or legally, that undergoing the cervical epidural itself was the injury he sustained.

Instead, in his presentation of actual evidence, Kent presented evidence only that the epidural exacerbated his injuries. In his declaration in support of his opposition, Kent stated: "I had neck pain after the auto accident July 25th, 2016. This neck pain significantly increased after the cervical epidural

---

[1] Kent attached a set of medical records from a Dr. Helms as Exhibit A to his declaration. Assuming for the sake of argument these records were admissible, Kent did not offer any evidence that showed Dr. Helms was qualified as an expert on the issue of epidural injections. Additionally, Kent did not cite or refer to the medical records of Dr. Helms in his separate statement. Thus the records were not properly before the court to support Kent's opposition to the motion. In opposition to the motion, Kent offered the declaration of his expert witness, Dr. Walker. However, Dr. Walker did not discuss the cervical epidural at all. He only discussed the steroid injections to Kent's thumb.

injection on September 24th, 2016." He did not declare that he suffered injury from the mere performance of the epidural.

In response to Wu's separate statement of undisputed fact that Kent's "neck pain with immediate onset after a motor vehicle accident was consistent with Dr. Wu's [diagnosis] of . . . spondylopathy of the cervical and lumbar region," Kent stated: "Disputed. Plaintiff complained of neck pain following [motor vehicle accident], plaintiff also complained of increased neck pain following unnecessary Cervical Epidural by Dr. Wu. Declaration of Joshua Kent."

In response to Dr. Wu's separate statement that "[a]ny alleged negligent treatment did not cause plaintiff any injury," Kent replied: "Disputed. Injections of excess steroids caused Joshua Kent's injuries. Declaration of Dr. John Walker." In response to Dr. Wu's statement that "no alleged violation of the standard of care by Dr. Wu caused or contributed to plaintiff's injuries," Kent responded: "Disputed. The treatment rendered by Dr. Wu to plaintiff fell below the standard of care and resulted in the plaintiff's ruptured thumb tendon." Thus, while Kent argued that negligent care or care in violation of the standard of care caused him injury, the only injury he identified was to his thumb.

Viewing the record as a whole, we conclude Kent did not fully develop or support his injury was having to undergo the cervical epidural itself, a self-evident injury. Summary judgment was properly granted.

II.     *Kent Did Not Plead a Lack of Consent in His Complaint and So Could Not Raise This Issue in Opposition to Summary Judgment.*

Kent also contends causation is "self-evident" when a doctor performs a medical procedure without consent.  In his complaint Kent did not plead lack of consent, and never raised the issue before his opposition.  Defendants moving for summary judgment need address only the issues raised by the complaint, and plaintiffs may not bring up new issues in their opposing papers.  (*Kanovsky v. At Your Door Self Storage* (2019) 42 Cal.App.5th 594, 601.)  If Kent wished to raise this claim, he should have sought leave to amend his complaint before the hearing on the summary judgment motion.  (*Johnson v. The Raytheon Co., Inc.* (2019) 33 Cal.App.5th 617, 636.)

III.    *Dr. Richeimer's Declaration Is Sufficient to Establish Lack of Causation for Kent's Thumb Injuries.*

Kent contends the trial court erred in granting summary judgment because Dr. Richeimer's declaration was conclusory and so insufficient to establish a lack of causation.  Wu contends Kent forfeited this claim by failing to object to the declaration in the trial court.

Wu relies primarily on our decision in *Fernandez v. Alexander* (2019) 31 Cal.App.5th 770 in which we stated that plaintiff's failure to object to the declaration of defendant's expert witness had forfeited her two claims that (1) the witness's opinion on causation was conclusory and speculative, and (2) defendant had failed to carry his burden of producing evidence demonstrating that there was no triable issue of material fact as to causation.  (*Id.* at p. 780.)

12

Kent responds that *Fernandez* is against the weight of California law. He contends a trial court cannot grant summary judgment if the moving party's evidence is insufficient to meet the party's initial burden, even when no objections are made and no opposition is filed. (*Y.K.A. Industries, Inc. v. Redevelopment Agency of City of San Jose* (2009) 174 Cal.App.4th 339, 367). He also contends a moving party's burden "cannot be satisfied by an expert declaration consisting of ultimate facts and conclusions that are unsupported by factual detail and reasoned explanation, even if it is admitted and unopposed." (*Doe v. Good Samaritan Hospital* (2018) 23 Cal.App.5th 653, 657.)

Our statement in *Fernandez* is effectively dicta, as we considered plaintiff's claim but found the expert opinion sufficient. We take essentially the same path here: assuming the broad claim is not forfeited, we find Dr. Richeimer's declaration constitutes sufficient evidence to negate causation.

1. <u>Dr. Richeimer's Declaration Contains Sufficient Factual Detail And Reasoned Explanation</u>

An expert's declaration in support of summary judgment must be supported by reasons or explanations and must be detailed and have a factual basis. (*Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 524; *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123.) "[A]n opinion unsupported by reason or explanation does not establish the absence of a material fact issue for trial, as required for summary judgment." *(Kelley v. Trunk,* at p. 524.) The summary judgment standard "is not satisfied by laconic expert declarations which provide only an ultimate opinion, unsupported by rational explanation." (*Id.* at p. 525.)

13

Kent and Wu both cite to various cases which they contend show the insufficiency or sufficiency of Dr. Richeimer's declaration. We think the declaration can best be evaluated in light of the complexity of the case for which it is offered.

This is, in fact, a fairly simple medical malpractice claim. It involves treatment for hand and neck injuries sustained in a car accident, and a claim that the treatment provided by defendant exacerbated those injuries or caused new and more serious injuries. Dr. Richeimer appropriately identified the materials he reviewed, and also described certain key pieces of information in those records which supported his expert opinion on lack of causation. Dr. Richeimer noted that when Kent went to the emergency room six days after his motor vehicle accident, Ken stated that "*since the accident*, he had experienced lower back, right wrist/thumb, and right foot pain." (Italics added.) Dr. Richeimer noted Kent's description of his pain when he was first seen by Dr. Wu: Kent "described the thumb pain as throbbing, shooting, sharp, and a 9 out of 10 in severity." Dr. Richeimer pointed out that Dr. Wu concluded "the right thumb pain was indicative of tenosynovitis." Dr. Richeimer also noted that Kent complained of "right hand and wrist pain and numbness in his right thumb" a month later to neurologist Spokoyny, and that Spokoyny determined to a reasonable degree of medical probability, that Kent's right and hand and wrist pain and numbness in his right thumb were "the direct result of the injuries he sustained [in a] motor vehicle accident."

Dr. Richeimer opined Kent's complaint of pain which began immediately after a vehicle accident was consistent with Wu's diagnosis of right thumb pain and that Spokoyny's assessment that Kent's hand and wrist pain and thumb numbness were a

14

direct result of the vehicle accident was "accurate and appropriate." Only then did Dr. Richeimer state that based on the materials he had reviewed and his personal knowledge, background, training, and experience, it was his expert opinion that Kent's "complaints are consistent with the mechanism of car accident injuries . . . ."

These statements are more than sufficient to show the facts which underlay Dr. Richeimer's opinion: the timing and nature of the injuries combined with a finding by a neurologist that the injuries were not neurological. Moreover, by finding that Dr. Spokoyny's determination was accurate and correct, Dr. Richeimer agreed that to a reasonable degree of medical probability, the injuries were caused by the vehicle accident.

2. Dr. Richeimer Reviewed Information About Kent's Injury After Wu's Treatment Ended.

Kent more specifically contends that Dr. Richeimer's declaration is deficient because the doctor "did not know anything about what happened to Kent's thumb after Dr. Wu's treatment." Kent contends Dr. Richeimer did not know that Kent had suffered a ruptured thumb tendon after Wu's treatment because Richeimer never examined Kent and the only medical records he reviewed from after Wu's treatment were the records of a neurologist. Kent cites Dr. Richeimer's declaration itself and pages 186–187 of the clerk's transcript to support this claim. Kent is mistaken.

Dr. Richeimer stated that he reviewed "the Declaration of Jessica Muñoz, and copies of the records as identified in Ms. Muñoz's declaration." Among the exhibits to Ms. Muñoz's declaration were Kent's responses to special interrogatories in which Kent identified specific physical injuries to his right

15

thumb, stating another doctor, Dr. Moheimani, had observed " 'discoloration and atrophy of the extensor pollicis longus.' " Dr. Richeimer also declared: "It is my understanding based upon *plaintiff's responses to written discovery* that plaintiff's only contention against defendants is that as a result of Dr. Wu's treatment, plaintiff has sustained permanent injuries to his cervical spine and right thumb/wrist." (Italics added.) Thus, Dr. Richeimer did have information about Kent's condition as of January 2018 when Kent signed the interrogatory responses. This was about 15 months after Kent's September 2016 visits to Dr. Wu.

As for Kent's claim that Dr. Richeimer was ignorant of Kent's ruptured thumb tendon, we share that ignorance. There is no evidence in the record on appeal that Kent suffered such a rupture. The document at pages 186–187 of the clerk's transcript is a report from Mink Radiologic Imaging. There are numerous evidentiary issues raised by this report.[2] We focus on two key issues: 1) the report says only that Kent's tendon has "marked attenuation or perhaps complete rupture"; and 2) the report is not referenced in the separate statement as required. (*Parkview Villas*, *supra*, (2005) 133 Cal.App.4th at p. 1214 [each party also

---

[2] In the clerk's transcript, the Mink report appears after Kent's declaration, following a tab page labelled Exhibit B. The declaration itself does not refer to the Mink report or to an Exhibit B. There is no basis for us to consider this random document of unknown provenance. Dr. Walker, offered by Kent as an expert witness, did state that he reviewed the Mink report. Experts may rely on hearsay such as the unauthenticated Mink report, but the trial court ultimately found, correctly, that Dr. Walker did not qualify as an expert.

must supply a 'reference to the supporting evidence' in its separate statement])[3]

To the extent Kent complains that Dr. Richeimer did not describe Kent's injuries in the declaration, Kent has forfeited any such objection by failing to make it in the trial court. This is not, as Kent suggests, a situation where Dr. Richeimer did not know anything about Kent's later medical condition. If Kent had objected to the lack of a description of his injuries in the Richeimer declaration, the doctor could, at a minimum, have clarified what he learned about Kent's injuries from his written discovery responses, and possibly also from Kent's deposition, which the doctor also reviewed. This sort of gap filler evidence is precisely the sort of evidence a moving party may expect to offer after a gap in the original evidence is created by the opposition. (See *Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1538.)

---

[3] In response to Wu's statement that no alleged violation of the standard of care caused Kent's injuries, Kent replied: "Disputed. The treatment rendered by Dr. Wu to the plaintiff fell below the standard of care and resulted in plaintiff's ruptured thumb tendon." There is no record cite.

Kent mentioned a ruptured thumb tendon only one other time in the separate statement. In response to Dr. Wu's statement that Kent's "complaints are consistent with the mechanism of car accident injuries and not Dr. Wu's treatment," Kent replied: "Disputed. Plaintiff did not suffer a ruptured tendon in the accident, only a sprain or tenosynovitis, refer to Exhibit C." Exhibit C is Dr. Wu's medical records.

17

### 3 Information About the Type or Amount of Steroids Injected Was Unnecessary.

Kent also contends the Richeimer declaration is deficient because he "did not know any of the details about Dr. Wu's treatment of Kent's thumb. All he stated was that Dr. Wu had 'administered steroid injections' to Kent's thumb on two occasions. . . . He did not know the number of injections or the type or amount of steroid medication that was injected each time."

Once Dr. Richeimer identified the cause of Kent's thumb injury as the car accident to a reasonable degree of medical certainty, he was not required to expressly opine that all other proffered causes did not, to a reasonable degree of medical certainty, cause the injury. Put differently, proving one cause to a medical probability eliminated all other proffered causes. Medical probability is 51 percent. An injury which has a 51 percent probability of being caused by a vehicle accident cannot also have a 51 percent probability of being caused by steroids.[4]

Nevertheless, Dr. Richeimer did elect to discuss Kent's theory of causation due to steroids. Dr. Richeimer opined Kent's complaints were not consistent with Wu's treatment. He also opined "to a reasonable degree of medical probability no alleged violation of the standard of care by Dr. Wu caused or contributed to plaintiff's injuries." Dr. Richeimer had previously described Wu's treatment as steroid injections into Kent's right thumb "insertion and sheath" on Kent's first visit, and additional steroid

---

[4] It still might be possible for an action or inaction to be a contributing cause to the injury, but this was not Kent's claim.

injections into Kent's right thumb "tendon and insertion" two weeks later.  Thus, Dr. Richeimer's opinion as a whole was that steroid injections were not consistent with Kent's thumb injuries and that even if administered incorrectly, they did not cause those injuries to a reasonable degree of medical certainty.

Kent contends, in effect, that Dr. Richeimer could not form this opinion without knowing the type and amount of steroids injected.  Dr. Richeimer's opinion was that steroids did not cause the type of thumb injury suffered by Kent, even if improperly administered.  The time to dispute that was in the trial court, with expert testimony that the amount or type of steroids mattered and that some type or amount could cause the thumb injury suffered by Kent.  Kent failed to do this.

Once Dr. Richeimer gave his opinion that steroids were not consistent with Kent's injuries, there was little else to say.  In this regard, the opinion in *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480 (*Ochoa*) discussing the sufficiency of expert declarations on causation is helpful.  The plaintiff in *Ochoa* contended she suffered aggravated respiratory problems due to a methane leak in her new home.  (*Id*. at pp. 1482–1483.)  Defendant moved for summary judgment on lack of causation and presented the declarations of two expert witness, a toxicologist and a pulmonary specialist.  (*Id*. at p. 1483.)  As the court summarized, the toxicologist "declared that '[e]xposure to methane gas has no direct toxic respiratory effect, short of asphyxiation.'  Thus, in his opinion there cannot be a causal link between appellant's alleged respiratory injuries and exposure to methane gas."  (*Id*. at p. 1486.)  The pulmonary care medical specialist "declared that 'exposure to methane gas and/or the odorants added to methane gas would not have caused, nor have

19

aggravated, plaintiff's allergies nor her asthma condition.' He also declared that her flu-like symptoms could not have been caused by methane gas exposure. It was his opinion that the aggravation of her respiratory condition was 'most likely due to her move from an apartment, where there was little adjacent plant life, to her present home in Merced.' " (*Id*. at p. 1487.)

The Court of Appeal held "the trial court correctly concluded that PG&E provided competent declaratory evidence showing that methane gas cannot cause or exacerbate the ailments from which appellant suffered" and so shifted the burden to appellant to produce evidence sufficient to create a triable issue of fact on causation." (*Ochoa, supra,* 61 Cal.App.4th at p. 1488.) The same is true here.

IV. *Dr. Walker Was Not Qualified as an Expert and So His Declaration Did Not Create Triable Issues of Material Fact Concerning Causation.*

Kent contends that even if Dr. Richeimer's declaration was evidence negating causation, the declaration of his expert Dr. Walker created a triable issue of material fact as to the causation of Kent's thumb injuries. Kent acknowledges that his expert's declaration was conclusory, but contends it was no more conclusory than Dr. Richeimer's declaration, with an important difference being that Dr. Walker's declaration must be construed liberally while Dr. Richeimer's declaration must be construed strictly. We do not agree that Richeimer's three and a-half page, 21-paragraph declaration is as conclusory as Dr. Walker's one-page, seven-paragraph declaration, but the content or length of Walker's declaration is not the point. The trial court found Kent failed to establish that Dr. Walker was, in fact, an expert. The court explained: "Dr. Walker's declaration provides that he is a

20

medical doctor licensed in California, but does not provide information that qualifies Dr. Walker to opine on Dr. Wu's conduct. . . . Dr. Walker does not state what kind of medicine he practices and plaintiff has not presented his resume."

The record on appeal suggests Kent never filed Dr. Walker's resume with the court; the only copy in the clerk's transcript is found as an exhibit to a declaration in support of Wu's reply brief. The declaration states that Wu received the resume shortly before his reply brief was due. The court's comments indicate the court did not consider this late-served (and apparently unfiled) resume. We see no abuse of discretion in this decision.

Had the court considered the resume, there can be little doubt the court's conclusion would have been the same. The copy of the resume sent to Wu is woefully out of date. It is a 2010 version of the resume and shows that Walker's medical license would expire in October 2012.[5] There is no indication of Dr. Walker's training or work experience in the eight years between the date of his resume and the filing of his declaration.

V.     *The Denial of the Motion for a New Trial Was Proper for the Same Reasons the Grant of Summary Judgment Was Proper.*

Kent contends the trial court erred in denying his motion for a new trial. The motion was made on the grounds that Wu did not meet his initial burden on summary judgment and that

---

[5]     Dr. Walker stated in his declaration that he is a "medical doctor licensed by the State of California" but did not provide supporting details such as his license number or its expiration date.

21

there was a triable issue of fact.  He contends the denial was wrong for the same reasons the grant of summary judgment was wrong.

Even though it is the duty of the appellate court in reviewing the denial of a new trial motion to review the entire record, "an appellant has a duty to make a 'cognizable argument on appeal as to why the trial court abused its discretion in denying the motions.' [Citation.]  Mere repetition of the arguments made in support of the motion in the trial court is not sufficient." (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.)

Given Kent's cursory argument, we will simply state the trial court's denial of the new trial motion was correct for the same reasons the grant of summary judgment was correct.  Dr. Richeimer's declaration was sufficient evidence to negate causation, Dr. Walker was not qualified to testify as an expert, and Kent did not clearly raise the theory of self-evident injury in his complaint or in opposition to summary judgment.

The only new argument Kent raises concerns the trial court's finding that the proof of service of the notice of intent to file a new trial motion was defective.  We agree with Kent the trial court misread the amended proof of service.  The document, dated March 29, 2109, states the notice was mailed by Daniel Cabilo on March 28, 2019.  However, this is relevant only if we were to decline to decide the motion based on untimely service. We do not do so.

**DISPOSITION**

The judgment is affirmed.  Respondent is awarded costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, J.


We concur:



BIGELOW, P. J.




GRIMES, J.